Elmer Dave JONES, Jr., et al.

v.

**UNITED GAS IMPROVEMENT CORP.**

Civ. A. No. 73-2485.

United States District Court,
E. D. Pennsylvania.

July 16, 1975.

**4**

Michael H. Cox, Howard L. Schambelan, Philadelphia, Pa., for plaintiff.

Mark S. Dichter, Richard P. Brown, Jr., Joseph I. Goldstein, Philadelphia, Pa., for defendant UGIC.

Glenn V. Whitaker, Washington, D.C., Warren J. Borish, Philadelphia, Pa., for defendant Local Union 600.

## MEMORANDUM AND ORDER

FOGEL, District Judge.

This is an employment discrimination case brought by plaintiffs Elmer Dave Jones, Jr., and Frank McCracken, against defendant United Gas Improvement Corporation (UGI), based upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, (Title VII), and the Civil Rights Act of 1870, 42 U.S.C. § 1981 (§ 1981). The background and procedural history of the litigation have been discussed in a previous decision on this matter, reported at D.C., 383 F.Supp. 420 (1974).

Before us at this juncture are the following matters for determination: (1) plaintiffs' motion to intervene or join

Clifford Anderson as a party plaintiff; (2) defendant's motion to join a labor organization as an additional defendant, pursuant to Rule 19(a) of the Federal Rules of Civil Procedure; and (3) plaintiffs' motion for class action certification, under Rule 23(c). For the reasons discussed, *infra*, we shall grant the motions to add a party plaintiff, to join an additional party defendant, and to certify this proceeding as a class action, subject to the conditions and limitations set forth in this opinion.

I. *Disposition of the motion to add Clifford Anderson, a member of Local 600, as a party plaintiff.*

In the Memorandum and Order of September 25, 1974, we dismissed one of the original defendants in this action, Gas Fitter-Utility Employees Local Union No. 600, affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (Local 600), on the ground that the plaintiffs lacked standing to name this local union as a defendant, because neither of the named party plaintiffs had ever been a member of local 600, nor had either of them ever applied for, or held a job within the bargaining unit represented by Local 600. We stated, however, that should facts elicited through discovery in the course of this litigation establish a basis for rejoining Local 600, an appropriate motion would be reconsidered upon the state of the record then existing. 383 F.Supp. at 432–436.

Counsel for plaintiffs now seek to add as an additional party plaintiff, Clifford Anderson, a black employee of UGI, who works at its Reading division, and who is a member in good standing of that Union.

■ Whether considered as a motion to add a party under Rule 21, see *Gilbert v. General Electric Company*, 347

F.Supp. 1058, 1059 (E.D.Va.1972), or as a motion by Anderson to intervene in his own right under Rule 24(b),[1] see *Braniff Airways, Inc. v. Curtiss-Wright Corporation*, 411 F.2d 451, 455 (2d Cir. 1969), we are satisfied that it is appropriate to exercise our discretion in a manner which will enable Anderson to become a party to this litigation as a plaintiff. There is no doubt that Anderson's claim, based upon alleged racial discrimination directed at him as an employee, poses questions of law and fact in common with those of the underlying action of the other plaintiffs. Moreover, at this stage of the proceedings, the addition of Anderson as a party will not delay or prejudice the rights of the original parties to this action.

■ Finally, the fact that Anderson may have failed to seek administrative relief before the EEOC *is not a jurisdictional bar to the maintenance of an action in this Court under § 1981, Young v. International Telephone and Telegraph Co.*, 438 F.2d 757, 762–763 (3d Cir. 1971); *nor is it a bar under Title VII, because Jones complied with the jurisdictional prerequisites to his Title VII action*. However, Anderson's participation under Title VII *will be limited* to the issues which were the subject of Jones' complaint before the EEOC, *Oatis v. Crown Zellerbach Corporation*, 398 F.2d 496, 499 (5th Cir. 1968). Accordingly, the motion to add Anderson as a plaintiff will be granted, subject to the limitations we have spelled out with respect to the outer parameters of the relief he may be afforded.

Although plaintiffs have made no motion at this time to rejoin Local 600 as a defendant in this action, they do not oppose the motion of UGI, *infra*.

II. *The motion of UGI to join Local 600 as an additional defendant.*

■ In the previous Memorandum and Order in this action, we noted that

---

1. Anderson is represented by the same counsel who also represent Jones, McCracken,

and the potential class members in this action.

while no motion was then pending under Rule 19(a) of the Federal Rules of Civil Procedure, subsequent developments in the case could warrant consideration of such a motion, citing *Hodgson v. School Board, New Kensington Arnold School District*, 56 F.R.D. 393 (W.D.Pa.1972). See 383 F.Supp. at 435–436, n. 30. Defendant UGI now contends that if Clifford Anderson is permitted to intervene, or join as a plaintiff in the action, Local 600 must be joined as a defendant. We agree.

In his proposed "Complaint in Intervention", Anderson alleges, *inter alia,* that he has been discriminated against during the course of his employment with respect to:

(a) job assignments;

(b) pay;

(c) promotional opportunities and advancement;

(d) fringe benefits;

(e) testing when hired;

(f) seniority rights; and

(g) other conditions of employment.

It is undisputed that some or all of these conditions of employment are controlled by the collective bargaining agreement between Local 600 and UGI. Under these circumstances, we agree with the Court in *New Kensington, supra,* 56 F.R.D. at 395:

This action endemically involves the potential for altering and restructuring the compensation provisions of the collective bargaining agreement between the defendant and the proposed defendants. From that altering and restructuring there arises at least a possibility of later action by the proposed defendants against the named defendants. Therefore, I think that the purposes of Rule 19 would best be served by granting the named defendants' motion. See *Balter v. Ickes*, 67 App.D.C. 112, 89 F.2d 856 (1937), cert. den'd, 301 U.S. 709, 57 S.Ct. 941, 81 L.Ed. 1363 (1937); *Window Glass Cutters League v. American St. Gobain Corp.*, 428 F.2d 353 (3d Cir. 1970); *Neal v. System Board of Adjustment*, 348 F.2d 722 (8th Cir. 1965); and *Bond v. Harris*, 239 F. Supp. 427 (D.C.S.D.N.Y.1964).[2]

■ In a memorandum filed in support of its earlier motions for dismissal or, in the alternative, for summary judgment, Local 600 argued that it could not be named as a defendant in the instant action because plaintiff Jones had failed to name the union in his charge before the E.E.O.C. This is a correct statement of the law as it has evolved under Title VII, *Williams v. General Foods Corporation*, 492 F.2d 399, 404–405 (7th Cir. 1974), *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969), *Mickel v. South Carolina State Employment Service*, 377 F.2d 239 (4th Cir. 1967), cert. den. 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166 (1967).[3] However, even if we assume, *arguendo,* that these decisions are controlling in a situation in which a union is sought to

---

2. We are aware that joinder under Rule 19 was denied *without a statement of the reasons* for such denial in a similar case decided by Judge Lacey in the District of New Jersey, *Hodgson v. Board of Education, Parsippany-Troy Hills*, 344 F.Supp. 79–86 (D.N.J. 1972). Under the circumstances of the instant case, however, we agree with Judge Teitelbaum that the correct standard is whether there is a possibility of later litigation instituted by the proposed additional defendant against the named defendant who seeks joinder. See *New Kensington, supra,* 56 F.R.D. at 395. The possibility of such litigation, even though it might fail on the merits, see *Savannah Printing Specialties & Paper Products Local Union 604 v. Union Camp Corporation*, 350 F.Supp. 632, 636–637 (S.D.Ga.1972), is sufficient under these circumstances to permit joinder.

3. This rule may not be applicable when there is a substantial identity of parties before the E.E.O.C. and the Court. *Chastang v. Flynn and Emrich Company*, 365 F.Supp. 957, 961–964 (D.Md.1973). In the case at bar, of course, there is no such substantial identity between UGI and Local 600.

be joined by a defendant rather than named by plaintiffs in the original complaint, it is clear that the limitation has no applicability under § 1981, *Sabala v. Western Gillette, Inc.*, 362 F.Supp. 1142, 1148 (S.D.Tex.1973), see *Williams v. General Foods Corporation, supra*, 492 F.2d at 405.

The motion of UGI to join Local 600 as a defendant in this action will accordingly be granted. At this time, however, we shall limit the claims against Local 600 to those which may be properly asserted under § 1981.[4]

III. *The motion for class action certification.*

In our discussion of the class aspects of this litigation, we shall focus on the following areas of dispute between the parties: (1) the inclusion of Spanish-surnamed individuals within the class which is to be determined as appropriate persons to whom relief may be granted under Title VII and § 1981; (2) the effect of the applicable statutes of limitations under Title VII and § 1981; (3) the geographical situs of UGI facilities which are controlling with respect to delineation of the scope of the class; and (4) compliance with the formal requirements of Rules 23(a) and 23(b)(2).

We shall discuss these issues *seriatim*.[5]

4. We need not decide at this stage whether the rule of *Williams v. General Foods Corporation, supra*, and cases cited in text, are applicable when a union is sought to be joined by a defendant rather than named by plaintiffs in the complaint, nor do we express any view with respect to the types of substantive relief which may be granted under § 1981 and Title VII, respectively.

5. Certain contentions, formerly pressed by UGI, have become moot in light of our disposition of the motions to add Clifford Anderson as a plaintiff and Local 600 as a defendant.

Initially, UGI claimed that Jones and McCracken were improper representatives of unionized employees, because neither named plaintiff had belonged to a union nor had

1. *The inclusion of Spanish-surnamed individuals within the class.*

Although the Puerto Rican Fraternity of Philadelphia has been dismissed as a plaintiff in this action, Memorandum and Order of September 25, 1974, 383 F.Supp. at 426–428, the remaining plaintiffs seek to include Spanish-surnamed individuals within the class to be determined, and to litigate the issue of alleged discrimination against these individuals in the instant action. That contention presents two issues for decision: (1) the inclusion of discrimination against Spanish-surnamed individuals within the cause of action under Title VII, and (2) the applicability of § 1981 to alleged discrimination against Spanish-surnamed individual.

a. *The inclusion of discrimination against Spanish-surnamed individuals in the cause of action under Title VII.*

Plaintiffs contend that discrimination against Spanish-surnamed individuals must be included within the scope of their cause of action under Title VII. We shall limit the Title VII action to racial discrimination against blacks, and so hold for the following reasons:

■■ Unlike 42 U.S.C. § 1981, Title VII prohibits discrimination based upon national origin. 42 U.S.C. § 2000e–2.

been included within a collective bargaining unit. Anderson, however, is a member in good standing of Local 600, and an objection on this ground cannot now be asserted.

UGI also claimed that McCracken and Jones, neither of whom is presently employed by the company, were improper representatives of a class which included present and future employees. This contention is now moot, of course, since Anderson is employed by UGI at its facility in Reading, Pennsylvania. In any event, a similar argument was rejected by the Court of Appeals for the Third Circuit in *Wetzel v. Liberty Mutual Insurance Company*, 508 F.2d 239, 247 (3d Cir. 1975), in conformity with Chief Judge Lord's landmark opinion in *Mack v. General Electric Co.*, 329 F.Supp. 72, 76 (E.D.Pa.1971).

As the term is used in Title VII, "national origin" refers not to alienage, but to "the country where a person was born, or, more broadly, the country from which his or her ancestors came", *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973). Discrimination against individuals solely because of a Spanish-speaking background clearly falls within the proscription of the statute, *id.*, 414 U.S. at 92, n. 5, 94 S.Ct. 334, 38 L.Ed.2d 287.

In this case, however, the named plaintiffs are both black. Jones filed a charge of discrimination with the EEOC on July 7, 1971, in which he alleged harassment by UGI supervisors and fellow employees because he was black, and further asserted that "the Company's employment practices operate in such a manner as to limit the opportunities for Negroes in terms of hire, classification, promotional terms and other conditions of employment."[6] McCracken did not file a charge with the EEOC, although we previously ruled that he may remain a named plaintiff in the action, subject to the limitation that he cannot raise any issues which were not proferred by Jones. Memorandum and Order of September 25, 1974, 383 F.Supp. at 426. See *Oatis v. Crown Zellerbach Corporation*, 398 F.2d 496, 499 (5th Cir. 1968). Neither Jones nor McCracken is Spanish-surnamed, and thus neither can claim that he is the victim of discrimination on the basis of national origin. The question for decision is whether the named plaintiffs who are black, including one, who charged before the EEOC that UGI was guilty of racial discrimination against blacks, may nevertheless represent a class which includes not only blacks, but Spanish-surnamed individuals as well, in this action.

The relationship between the initial charge before the EEOC and the scope of a later action in the District Court was extensively discussed in the leading case of *King v. Georgia Power Co.*, 295 F.Supp. 943, 947 (N.D.Ga. 1968) (footnote omitted, emphasis added):

> The correct rule is that the complaint in the civil action is *confined to those issues the original [complainant] has standing to raise*, but may properly encompass any such discrimination like or reasonably related to the allegations of the charge and growing out of such allegations during the pendency of the case before the Commission.

Thus, in keeping with the remedial purpose of the statute, a plaintiff in the District Court will not be penalized for failure to specifically describe in his initial charge before the EEOC the exact type of discrimination to which he feels he has been subjected. As the Court noted in *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970), "the charging party may have precise knowledge of the facts concerning the 'unfair thing' done to him, yet not be fully aware of the employer's *motivation* for perpetrating the 'unfair thing.'" This liberal approach to the scope of the subsequent civil action, however, assumes that the original complainant had standing before the EEOC to raise the issues there presented, and could have been *himself* the victim of the discrimination complained of, even though he may have incorrectly characterized such discrimination in the initial charge. *King v. George Power Co., supra*, 295 F.Supp. at 947.

The operation of this rule may be understood by comparing *Sanchez v. Standard Brands, supra*, with several District Court cases which have accepted the *Sanchez* doctrine of liberal construction, yet have limited the scope of the civil action permitted under Title VII.

In *Sanchez*, the complaining party, a woman of Spanish surname, had checked only the box marked "sex" in her initial

---

6. "Charge of Discrimination", 7–7–71, attached as Exhibit A to the Complaint.

charge before the EEOC. In the District Court, however, she sought to base her action on national origin discrimination. The Court of Appeals, in an extensive opinion, concluded that national original discrimination was within the scope of the EEOC investigation which could reasonably be expected to grow out of the initial charge of unfair treatment. *Id.*, 431 F.2d at 466. It is important to note, however, that the complainant did have standing to allege discrimination based upon sex or national origin, since she could have been the victim of either.

In *Equal Employment Opportunity Commission v. New York Times Broadcasting Service, Inc.*, 364 F.Supp. 651 (W.D.Tenn.1973), an action brought by the EEOC, the Court refused to allow litigation of claims of racial discrimination when the original charging party, a white female, had alleged only discrimination based upon sex. The Court distinguished *Sanchez* on the ground that the complaint of discrimination before the EEOC in that case could "by its nature, or by reason of indefiniteness * * * involve, because of reasonable relationship, more than one category or area." The Court went on to state, 364 F.Supp. at 654 (emphasis added):

> * * * This is not the situation here—Wilson's charge is clear, concise and unambiguous; it applies *only* to alleged sex discrimination. If she, rather than EEOC were bringing this suit, *this white female could scarcely be held to be a proper representative of black employees generally.* * * *

Similarly, in *Equal Employment Opportunity Commission v. General Electric Co.*, 376 F.Supp. 757, 761 (W.D.Va. 1974), also an action filed by the EEOC, the Court granted summary judgment in favor of the defendant company on a sex discrimination count when the original charge before the EEOC was filed by a black man alleging racial discrimination:

This court is of the opinion that since a suit under Title VII brought by the EEOC must be based on a charge, the issues raised in the suit must be limited to claims which might have been raised by the charging party. To adopt the EEOC's position without such a limitation would be to allow suit on grounds unrelated to the charge filed with it and which could not reasonably have been expected to grow out of the charge of discrimination. In the case at bar, the allegations of sex discrimination against females grew out of a charge of racial discrimination in hiring filed by a black man. The EEOC fails to explain how this reasonably could have been expected.

In contrast, if the allegations of sex discrimination against females had developed from an investigation of a charge of racial discrimination by a black female, the court could perhaps hear the case regardless of whether or not the specific charging party herself had been the victim of sexual discrimination. This is because one would reasonably expect the EEOC to recognize that a charging party might incorrectly state in a charge the type of discrimination to which the charging party might have been subjected. Thus as the court noted in *Sanchez*, the remedial purposes of Title VII would hardly be served by requiring possibly inarticulate and unsophisticated working people for whom the statute was designed to protect to correctly state the precise type of discrimination in their charge to the EEOC in order to later bring suit on a different type of discrimination. This court agrees with *Sanchez* that the crucial element in a charge is the factual allegations and not the legal conclusion initially attached to the allegations. But as a caveat to this proposition, this court is of the opinion that the discrimination uncovered must at least have had the *potential* of

prejudicing the charging party in order to be the subject of a later suit growing out of the charge. This follows from the scheme of Title VII which appear to clearly require a relationship between the charge, the investigation and the suit.

376 F.Supp. at 761 (footnotes omitted).

■ In the instant case, the charge before the EEOC involved only discrimination against blacks. Further, neither Jones nor McCracken could be prejudiced by discrimination against Spanish-surnamed individuals. Since national origin discrimination was not charged before the EEOC, and since such discrimination did not have the *potential* of prejudicing either named plaintiff before us, we conclude that it may not properly be asserted in a civil action under Title VII.

■ Plaintiffs contend that such a rule is inapplicable in a case in which the EEOC has actually investigated discrimination against Spanish-surnamed individuals.[7] We cannot agree. In both *New York Times Broadcasting Service* and *General Electric, supra,* the EEOC had investigated discrimination not alleged in the original charge, and had made findings with respect to such discrimination. In each case, however, the District Court concluded that discrimination which was not alleged in the original charge, and was not of a character that could have prejudiced the charging party, could not constitute a proper cause of action thereafter. By the same reasoning, a private litigant should not be permitted, by the device of a class action, to avoid the procedural requirements of Title VII, on the ground that the EEOC went beyond the scope of his charge, and investigated discrimi-

nation from which he could not possibly have suffered.

We therefore conclude that Jones and McCracken may not represent Spanish-surnamed persons pursuant to the provisions of Title VII, nor will we permit litigation of discrimination against Spanish-surnamed persons under that statute.

b. *The applicability of § 1981 to discrimination against Spanish-surnamed individuals.*

Plaintiffs vigorously assert that § 1981 is applicable to alleged discrimination against Spanish-surnamed individuals. A careful examination of the wording of the statute, its legislative history, and the most persuasive judicial authority convinces us that this contention is without merit.[8]

Sections 1981 and 1982 are derived from the Civil Rights Act of 1866, c. 31, § 1, 14 Stat. 27 (April 9, 1866), which provided as follows, in pertinent part:

\* \* \* all persons born in the United States and not subject to any foreign power, \* \* \* are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like

---

7. See "Plaintiffs' Affidavit and Points of Authority in Support of their Motion for a Class Action".

8. This issue was briefly discussed in the Memorandum of September 25, 1974, 383 F.

Supp. at 428, n.14, with respect to the standing of the Puerto Rican Fraternity of Philadelphia, formerly a plaintiff in this action; the question was expressly left undecided at that point, because it had been neither briefed nor argued.

punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

The Act, passed over President Andrew Johnson's veto, was intended by its sponsors to implement the Thirteenth Amendment, which had been ratified four months earlier, and to grant to recently freed slaves the political and economic freedom which was intended to flow from the new constitutional amendment prohibiting slavery. "In light of the concerns that led Congress to adopt it and the contents of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest: *to prohibit all racial discrimination,* whether or not under color of state law, with respect to the rights enumerated therein * * * ," *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968) (emphasis added).

The Civil Rights Act of 1866 thus preceded the ratification of the Fourteenth Amendment. Indeed, the Joint Resolution of Congress submitting the Fourteenth Amendment to the states was supported by some legislators in order to resolve doubts as to the constitutional validity of that Act *as applied to the states. Hurd v. Hodge,* 334 U.S. 24, 32–33, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). With respect to its applicability to individuals, however, the Act derives its constitutional validity from the second section of the Thirteenth Amendment, *Jones v. Alfred H. Mayer Co., supra,* 392 U.S. at 437–444, 88 S.Ct. 2186, 20 L.Ed.2d 1189, which empowered Congress to pass laws necessary and proper "for abolishing all badges and incidents of slavery in the United States", the Civil Rights Cases, 109 U.S. 3, 20, 3 S. Ct. 1828, 27 L.Ed. 835 (1883).

Two years after the ratification of the Fourteenth Amendment, Congress reenacted the Civil Rights Act of 1866 in Section 18 of the Enforcement Act of 1870, c. 144, § 18, 16 Stat. 144 (May 31, 1870). Subsequently, portions of the 1866 Act were codified in §§ 1977 and 1978 of the Revised Statutes of 1874, now 42 U.S.C. §§ 1981 and 1982.

Section 1981 provides as follows:

*All persons within the jurisdiction of the United States* shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property *as is enjoyed by white citizens,* and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(emphasis added).

Section 1981 differs in one significant respect from the parallel provisions in the Civil Rights Act of 1866. While the 1866 Act extends its protection only to "citizens", defined as "all persons born in the United States and not subject to any foreign power * * * ," § 1981 is broader, covering "all persons within the jurisdiction of the United States."

Section 1982, however, retains the citizenship limitation of the original Act:

*All citizens* of the United States shall have the same right, in every State and Territory, as is enjoyed by *white citizens* thereof to inherit, purchase, lease, sell, hold and convey real and personal property.

(emphasis added).

Within this historical framework, we shall examine the pertinent decisions of the Supreme Court with respect to the extent of coverage of the statutory provisions derived from the 1866 Act.

In *Georgia v. Rachel,* 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966), a case involving the removal of state criminal proceedings under 28 U.S.C. § 1443, the Court noted:

The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of

rights, specifically defined in terms of racial equality. As originally proposed in the Senate, § 1 of the bill that became the 1866 Act did not contain the phrase "as is enjoyed by white citizens." That phrase was later added in committee in the House, apparently to emphasize the racial character of the rights being protected. More important, the Senate bill did contain a general provision forbidding "discrimination in civil rights or immunities", preceding the specific enumeration of rights to be included in § 1. Objections were raised in the legislative debates to the breadth of the rights of racial equality that might be encompassed by a prohibition so general as one against "discrimination in civil rights or immunities." There was sharp controversy in the Senate, but the bill passed. After similar controversy in the House, however, an amendment was accepted striking the phrase from the bill.

*Id.,* 384 US. at 791, 792, 86 S.Ct. at 1789 (footnotes omitted).

Under the original language of the 1866 Act, therefore, Congress prohibited *racial* discrimination between *citizens* with respect to the enumerated rights; that is, discrimination between *white and non-white citizens* of the United States.

Since § 1982 retained the citizenship limitation of the original Act, this statute has the same effect with respect to property rights that the 1866 Act had for a larger panoply of rights. As the Supreme Court noted in *Jones v. Alfred H. Mayer Co., supra,* 392 U.S. at 413, 88 S.Ct. at 2189, 20 L.Ed.2d 1189, § 1982 applies only to *racial* discrimination, and not to other forms of discrimination

prohibited by subsequent Civil Rights Acts (emphasis added):

 * * * [1982] deals only with racial discrimination and *does not address itself to discrimination on grounds of religion or national origin.*

 Section 1981, however, neither contains the citizenship limitation of § 1982, nor of its counterpart in the original Act, and thus is not limited to racial discrimination between citizens of the United States. With respect to the rights enumerated under § 1981 *all persons within the jurisdiction of the United States* are guaranteed the same freedom enjoyed by *white citizens* of the United States. The protection therefore extends to *aliens,* and the constitutional underpinning includes the Fourteenth as well as the Thirteenth Amendments. *Takahashi v. Fish and Game Commission,* 334 U.S. 410, 68 S.Ct. 1138, 92 L. Ed. 1478 (1948).

Thus it is not correct, strictly speaking, to state that § 1981 applies only to *racial* discrimination, nor can *Georgia v. Rachel, supra,* which dealt with the original 1866 Act, or *Jones v. Alfred H. Mayer Co., supra,* which considered § 1982, be cited in support of such a proposition. See e. g. *Schetter v. Heim,* 300 F.Supp. 1070, 1073 (E.D.Wis.1969) (no distinction drawn between § 1981 and § 1982). As the Court stated in *Takahashi v. Fish and Game Commission, supra,* 334 U.S. at 419–420, 68 S.Ct. at 1143:

 * * * Consequently the section [now codified in § 1981] and the Fourteenth Amendment on which it rests in part protect "all persons" against state legislation bearing unequally upon them either because of *alienage or color.*[9]

(emphasis added).

---

9. Of course, in *Jones v. Alfred H. Mayer Co., supra,* the Court subsequently held that § 1982 applies to private acts of discrimination as well as state action. The constitutional basis for such legislation was held to be the enabling clause of the Thirteenth

Amendment. A similar rationale has been utilized to apply § 1981 in the context of private employment discrimination. *See, e. g. Young v. International Telephone and Telegraph Co.,* 438 F.2d 757, 758–760 (3d Cir. 1971).

It is clear, however, that § 1981 does not apply to discrimination on grounds other than race or alienage. Many courts have stated that the statute is inapplicable to discrimination based upon *national origin*,[10] see e. g. *Marshall v. Plumbers and Steamfitters Local Union 60*, 343 F.Supp. 70, 72 (E.D.La. 1972), *Schetter v. Heim, supra*, 300 F. Supp. at 1073, or upon *sex*, *Braden v. University of Pittsburgh*, 343 F.Supp. 836, 837–838 (W.D.Pa.1972), vacated on other grounds, 477 F.2d 1 (3rd Cir. 1973),[11] *Fitzgerald v. United Methodist Community Center*, 335 F.Supp. 965, 966 (D.Neb.1972). While white persons have on occasion been permitted to bring actions under § 1982 based upon racial discrimination, it is clear that these decisions are based upon the injury done to *white* persons by racial discrimination against *blacks*. See e. g. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), which held that § 1982 prohibits the imposition of sanctions by private community recreational clubs against a white member for attempting to assign his interest to a black tenant; *Walker v. Pointer,* 304 F.Supp. 56 (N.D.Tex.1969), which held that § 1982 prohibits eviction of a white couple for entertaining black guests;

see also *Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205, 93 S. Ct. 364, 34 L.Ed.2d 415 (1972), which permitted an action under § 810 of the Civil Rights Act of 1968 that was instituted by white tenants who claimed injury in being denied the benefits of association with minority group tenants.

We are aware of two cases from the Eastern District of Missouri, upon which plaintiffs place great reliance, that appear to depart from these principles. In both cases, *Central Presbyterian Church v. Black Liberation Front*, 303 F.Supp. 894 (E.D.Mo.1969), and *Gannon v. Action*, 303 F.Supp. 1240 (E. D.Mo.1969), Judge Meredith found a cause of action under § 1981 in a suit by white church members against black militants who disrupted religious services. In effect, that Court found that § 1981 prohibits racial discrimination *against whites by blacks*, 303 F.Supp. at 1244.

The decisions in *Central Presbyterian Church* and *Gannon* have been seriously questioned, *Ripp v. Dobbs Houses, Inc.*, 366 F.Supp. 205, 211, n. 2 (N.D.Ala.1973), and a close reading suggests that the Court may have failed to consider a significant limiting clause within § 1981.[12] Even if these cases

10. To the extent that national origin discrimination also involves elements of discrimination based on race or alienage, § 1981 would be applicable.

11. The Third Circuit in *Braden* expressly declined to decide the question of the applicability of § 1981 to discrimination based on sex, 477 F.2d at 5, and vacated the District Court's dismissal to allow the development of a more complete record. We are in agreement with Judge Sorg that discrimination based on sex is not prohibited by § 1981.

12. The Court in *Gannon* stated the following with respect to the applicability of § 1981 to discrimination against whites by blacks, 303 F.Supp. at 1244:
 * * * Sections 42 U.S.C. §§ 1981–1985 are sometimes called the Reconstruction Civil Rights Acts. They were passed, along with companion criminal sections, in

1866, 1870, and 1871, to implement the newly ratified Thirteenth and Fourteenth Amendments to the Constitution. * * * These sections were designed to prevent racial discrimination performed under color of state law or by groups, such as the Ku Klux Klan, operating entirely outside of the law. While it is obvious that these statutes were passed primarily to insure the rights of non-whites, nothing in the statutes limits their application to situations where the civil rights of non-whites are being violated. The statutes are phrased in terms such as "all persons" and "all citizens", and the courts are bound to give these sections "a sweep as broad as (their) language." [citations omitted.] These statutes have been interpreted to apply to discrimination against whites, as well as to discrimination against other races. *Kentucky v. Powers*, 139 F. 452 (Cir.Ct.E.D.Ky.1905). It is clear that these statutes apply to racial discrim-

correctly state the law, however, they still deal with the area of *racial* discrimination, albeit the reverse of that racial discrimination against which the Reconstruction Civil Rights statutes were directed, and offer no support for the contention that § 1981 prohibits discrimination based on national origin, religion, sex, or other human characteristics. *Marshall v. Plumbers and Steamfitters Local Union No. 60, supra,* 343 F.Supp. at 72.

Similarly, we have carefully studied the opinion of the Circuit Court for the Eastern District of Kentucky in *Commonwealth of Kentucky v. Powers,* 139 F. 452 (Cir.Ct.E.D.Ky.1905), rev'd 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633 (1906), cited by plaintiffs, and by the Court in *Central Presbyterian Church* and *Gannon* for the proposition that § 1981 has a broader scope than its wording and legislative history would indicate. While there is language in the Circuit Court's opinion to the effect that § 1981 "is as broad as the fourteenth amendment as to the persons affected by it", the Court goes on to concede that the rights conferred are only those possessed by white citizens of the United States, 139 F. at 495. Further, *Powers* was a removal case, reversed by the Supreme Court in an opinion by the first Mr. Justice Harlan (which did not reach the issue of the scope of § 1981), and the lower court's view with respect to that section is clearly not authoritative in light of the recent Supreme Court de-

---

ination against all persons regardless of race.

While we agree that the civil rights statutes should be broadly interpreted to serve their remedial ends, we must respectfully disagree with the conclusion that § 1981 prohibits racial discrimination by blacks against whites. Sections 1981 and 1982 merely grant to "all persons within the jurisdiction of the United States" (§ 1981) or "all citizens" (§ 1982) the same rights in the enumerated areas "*as [are] enjoyed by white citizens.*" As Judge Bryan noted in *Gonzales v. Fairfax-Brewster School, Inc.,* 363 F.Supp. 1200, 1204, n.3 (E.D.Va.1973). private individuals and institutions "are free to discriminate against whites, or against other non-whites if whites are similarly discriminated against, without running afoul of § 1981."

In *Central Presbyterian Church*, the Court states, 303 F.Supp. at 901:

Plaintiffs allege that defendants have violated rights guaranteed by 42 U.S.C. § 1981. That section states: "All persons within the jurisdiction of the United States shall have * * * the full and equal benefit of all laws and proceedings for the security of persons and property * * *."

It is the opinion of the Court that plaintiffs have shown a violation of this right. Defendants have prevented the plaintiff church and its members from the right guaranteed by this section to equal benefit of laws for the security of property. This will also constitute a violation of section 1982. This section gives all citizens the same right to hold property. The defend-

ants' actions in this case have deprived plaintiffs of the right to use their property for religious services.

It appears that the Court in *Central Presbyterian Church* overlooked the limiting clause in § 1981, which is omitted from the excerpt of the statute there quoted. Section 1981 goes on to state that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State * * * to the full and equal benefit of all laws and proceedings for the security of persons and property *as is enjoyed by white citizens* * * *" It is this clause that has led us to conclude that § 1981 prohibits only that discrimination which is based upon race or alienage.

For an argument that the phrase "as is enjoyed by white citizens" was not intended as a limitation on the persons protected by § 1981, see Judge Blumenfeld's scholarly opinion in *Hollander v. Sears, Roebuck and Co.,* 392 F.Supp. 90 (D.Conn.1975). We cannot agree, however, that the clear wording of the statute should be overcome by the somewhat ambiguous legislative history, primarily certain remarks made on the Senate floor at the time of consideration of the bill which became § 1981. Even if we are wrong in this conclusion, though, there is no doubt that the scope of § 1981 does not extend beyond *racial* discrimination (and discrimination against aliens). Id. at 93–94 (slip opinion). No case has been cited to us which applies § 1981 to discrimination based upon national origin rather than upon race or alienage.

cision in *Georgia v. Rachel, supra*, also a removal case, which unequivocally holds that "Congress intended to protect a limited category of rights, specifically defined in terms of racial equality", when it enacted the Civil Rights Act of 1866, 384 U.S. at 791, 86 S.Ct. at 1789.

For these reasons, we conclude that the provisions of 42 U.S.C. § 1981 *are limited in their application to discrimination, the effect of which is to deny to any person within the jurisdiction of the United States any of the rights enumerated in that section, to the extent that such rights are enjoyed by white citizens of this nation. Discrimination on other grounds, such as religion, sex, or national origin, to which white citizens may be subject, as well as white non-citizens, non-white citizens, or non-white non-citizens, is not proscribed by the statute.*

In the instant case, plaintiffs have alleged, inter alia, discrimination against Spanish-surnamed individuals by defendant UGI. Since the record does *not* establish that such individuals are also aliens, see *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 92–93, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), we must characterize such alleged discrimination as that based upon national origin. In light of our holding that § 1981 *does not* prohibit national origin discrimination, plaintiffs have therefore failed to state a cause of action which would permit us to consider relief for Spanish-surnamed individuals.

2. *The effect of the applicable statutes of limitations upon the class action determination.*

In determining the proper scope of the class to be certified we must look to the applicable statutes of limitations in order to ascertain those employees whose claims are time barred, and are therefore to be excluded from consideration in these proceedings. *Wetzel v. Liberty*

*Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir. 1975). In the instant case, there are two separate limitation periods to be considered, the first under Title VII, and the second under § 1981.

a. *The applicability of the statute of limitations under Title VII.*

Plaintiffs argue that persons who have Title VII claims which accrued between July 2, 1965, and the present should be included in the class to be determined.[13] The Court of Appeals for the Third Circuit, however, has applied the statute of limitations set forth in Title VII to significantly narrow the time period within which former employees may assert claims cognizable in a class action. In *Wetzel v. Liberty Mutual Insurance Co., supra*, 508 F.2d at 246–247, the Court stated:

First, Liberty Mutual contends that it was error to include in the class all female technical employees who had been employed since July 1, 1965. It contends that employees whose claims are time barred by the statute of limitations contained in the[n] section 706(d) of Title VII, 42 U.S.C. § 2000e–5(d) (1970), should be excluded from the class.

We agree with Liberty Mutual that such individuals should have been excluded. At the time charges were filed with the EEOC, section 706(d) provided that where, as here, a charging party had instituted proceedings with a state agency which has jurisdiction over discriminatory employment practices, a charge must be filed with the EEOC within 210 days of the occurrence of the alleged unfair practice.

As stated in *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App. D.C. 69, 478 F.2d 979, 986 (1973):

Since a suit in court depends on an agency notice to sue letter and since the agency cannot take the case ini-

---

13. July 2, 1965 was chosen by plaintiffs because pertinent provisions of the Civil

Rights Act of 1964 became effective on that date. Pub.L. 88–352, Title VII, § 716(a).

tially unless the timely filing requirements are met, the timely filing requirements with respect to EEOC appears to be a jurisdictional prerequisite to court action under Title VII.

A plaintiff may bring a class action on behalf of those who have not filed charges with the EEOC, *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 719–720 (7th Cir. 1969); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir. 1968). This tolls the statute of limitations for all members of the class. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). But *Wetzel and Ross cannot represent those who could not have filed a charge with the EEOC at the time they filed their charges. CWA v. New York Telephone Co.*, 8 F.E.P. 509, 513 (S.D.N.Y.1974); *Culbert v. General Electric Co.*, 5 F.E.P. 969, 993 (E.D.Va.1973); *Garneau v. Raytheon Co.*, 3 F.E.P. 1315 [323 F.Supp. 391] (D.Mass.1971).

This conclusion does not mean, however, as Liberty Mutual contends, that the numerosity requirement of 23(a)(1) has not been met. Wetzel's and Ross' charges alleged the maintenance of discriminatory hiring and promotion policies up to the time of the filing of their complaint. Such policies are continuing violations of Title VII and would allow a filing of a charge at any time by a present employee. *Macklin v. Spector Freight Systems, Inc., supra*, 478 F.2d at 987–988. *The only employees barred from the class are those who left the employ of the Company more than 210 days before the filing of the charges with the EEOC by Wetzel and Ross.* (emphasis added, footnotes omitted).

Applying the teaching of *Wetzel*, we shall exclude from the class to be determined pursuant to Title VII those persons who could not have filed charges with the EEOC on July 7, 1971, the date on which Jones filed his charge. Since the applicable limitations period prior to the 1972 amendments was ninety days,[14] we shall exclude those persons who unsuccessfully applied for employment at, or who left the employment of UGI, more than 90 days prior to July 7, 1971, that is, prior to April 8, 1971.

b. *The applicability of the statute of limitations under § 1981.*

The instant action was filed in the District Court on November 1, 1973. Since we have previously determined that the general six-year statute of limitations in Pennsylvania, 12 P.S. § 31, is applicable in § 1981 cases involving allegations of employment discrimination, 383 F.Supp. at 428–432, UGI now contends that claims which accrued prior to November 1, 1967, are barred. Plaintiffs, on the other hand, argue that the filing of a charge with the EEOC tolls the statute of limitations under § 1981, and that only claims prior to July 7, 1965, would be barred by the statute.

At the time of the oral argument in the case at bar, there was clearly a conflict among the lower federal courts with respect to this issue. Compare *Jenkins v. General Motors Corporation*,

14. *See* former § 2000e–5(d), amended and relettered as § 2000e–5(e) by § 4(a) of Pub.L. 92–261, March 24, 1972, 86 Stat. 104. Section 14 of Pub.L. 92–261 provided as follows:

> The amendments made by this Act to section 706 of the Civil Rights Act of 1964 [42 U.S.C. § 2000e–5] shall be applicable with respect to charges pending with the Commission on the date of enactment of this Act and all charges filed thereafter.

While Jones' charge was pending with the EEOC on March 24, 1972, the date of enactment of the 1972 amendments, no other potential class member had then filed charges. Thus the ninety day limitations period under § 2000e–5(d) of the Act prior to the 1972 amendment, was clearly applicable to any potential charging party on July 7, 1971, the date on which Jones filed his charge with the EEOC.

354 F.Supp. 1040, 1045–1046 (D.Del. 1973) (no tolling) with *Guerra v. Manchester Terminal Corporation*, 498 F.2d 641, 648–652 (5th Cir. 1974) (tolling) and *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App.D.C. 69, 478 F.2d 979, 994 n. 30 (1973) (tolling). The issue has since been resolved by the Supreme Court in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), a decision which affirmed the Sixth Circuit in its conclusion that there was no tolling of the statute of limitations under § 1981 by the filing of a charge with the EEOC, 489 F.2d 525, 529–530, 531. Writing for the Court, Mr. Justice Blackmun stated:

> Petitioner argues that a failure to toll the limitation period in this case will conflict seriously with the broad remedial and humane purposes of Title VII. Specifically, he urges that Title VII embodies a strong federal policy in support of conciliation and voluntary compliance as a means of achieving the statutory mandate of equal employment opportunity. He suggests that failure to toll the statute on a § 1981 claim during the pendency of an administrative complaint in the EEOC would force a plaintiff into premature and expensive litigation that would destroy all chances for administrative conciliation and voluntary compliance. We have noted this possibility above and, indeed, it is conceivable, and perhaps almost to be expected, that failure to toll will have the effect of pressing a civil rights complainant who values his § 1981 claim into court before the EEOC has completed its administrative proceeding. One answer to this, although perhaps not a highly satisfactory one, is that the plaintiff in his § 1981 suit may ask the court to stay proceedings until the administrative efforts at conciliation and voluntary compliance have been completed. But the fundamental answer to petitioner's argument lies in the fact—presumably a happy one for the civil rights claimant—that Congress clearly has retained § 1981 as a remedy against private employment discrimination separate from and independent of the more elaborate and time consuming procedures of Title VII. Petitioner freely concedes that he could have filed his § 1981 action at any time after his cause of action accrued; in fact, we understand him to claim an unfettered right so to do. Thus, in a very real sense, petitioner has slept on his § 1981 rights. The fact that his slumber may have been induced by faith in the adequacy of his Title VII remedy is of little relevance inasmuch as the two remedies are truly independent. Moreover, since petitioner's Title VII court action now also appears to be time-barred because of the peculiar procedural history of this case, petitioner, in effect, would have us extend the § 1981 cause of action well beyond the life of even his Title VII cause of action. We find no policy reason that excuses petitioner's failure to take the minimal steps necessary to preserve each claim independently.

421 U.S. at 465, 95 S.Ct. at 1722 (footnote omitted).

Accordingly, we will exclude from the class to be determined pursuant to § 1981 persons who unsuccessfully sought employment at, or who left the employment of UGI, prior to November 1, 1967.

3. *The geographical situs of UGI facilities which are controlling with respect to delineation of the scope of the class.*

Defendant UGI is a public utility company rendering natural gas service in eastern and central Pennsylvania with primary facilities located in Harrisburg, Lancaster, Lebanon, Reading, and Allen-

town, Pennsylvania.[15] Plaintiffs seek to include employees at all of these facilities within the class to be certified. UGI contends, however, that the class should be limited to employees at the Reading and Temple facilities of the company. On the basis of the record before us, we agree with defendant's position.

Plaintiff Jones was employed by UGI from October of 1970, until July 6, 1971.[16] Although he was interviewed in Philadelphia, Jones was hired for the Central Gas Control Department, located initially in Reading, but transferred during 1971 to a new facility in Temple, Pennsylvania.[17] During the period in which Jones was assigned to the Temple facility, he worked as an electronic maintenance technician, which involved troubleshooting at other UGI locations in Pennsylvania.[18]

Plaintiff McCracken was employed in a clerical capacity from February until May of 1972, at the Reading facility of UGI.[19]

Plaintiff Anderson was hired during April of 1971, as a Customer Service Helper at the Reading facility, where he is presently employed. He is a member in good standing of Local 600.[20]

In summary, therefore, all of the named plaintiffs in this action were or are employed at UGI facilities in the vicinity of Reading, Pennsylvania.[21]

Jones was a technical employee, in the so-called "non-exempt salaried" classification; McCracken was a clerk, also "non-exempt salaried". Neither Jones nor McCracken was covered by any collective bargaining agreement, nor belonged to any labor organization. Anderson is a "non-exempt hourly" employee, represented by Local 600 and covered by the collective bargaining agreement to which that union is a signatory.

Two additional factors persuade us that the class should be limited, at this juncture, to employees in the Reading-Temple area.

*First,* plaintiffs were unable to demonstrate that employment and personnel decisions are made centrally by UGI as a corporation, rather than at the individual divisions. At the hearing on December 18, 1974, George Westerman, Vice-President of Administrative Services of UGI, testified that, in general, an employee in the non-exempt salaried classification would be hired for the facility at which he was recruited. If a division was having difficulty filling a position, the Philadelphia administrative offices, (now located in Valley Forge, Pennsylvania), might provide assistance, but this situation did not occur very often. (In Jones' case, however, he was recruited in Philadelphia for a position in Reading.) The only "central" recruiting effort, according to Mr. Westerman, was

15. Agreed Fact D, "Plaintiffs' and Defendant's Pre-Hearing Memorandum with respect to Class Action Determination", p. 4.

16. *Id.,* Agreed Fact A.

17. Testimony of George Westerman, Vice-President of Administrative Services of UGI Corporation, at the hearing on December 18, 1974.

18. Westerman testimony, *supra* at n. 17; Affidavit of Elmer Dave Jones, Jr., attached to "Plaintiffs' Reply to Defendant's Opposition to Plaintiff's Motion for Class Action Certification."

19. Agreed Fact C, "Plaintiffs' and Defendant's Pre-Hearing Memorandum with respect

to Class Action Determination." In the affidavit of Mr. Westerman, submitted in connection with the hearing on December 18, 1974, McCracken's dates of employment are stated to be March 29, 1972 until May 19, 1972. In any event, it is undisputed that McCracken was assigned to the Reading facility during the period of his employment.

20. "Complaint in Intervention", ¶¶ 4–6; these facts are undisputed.

21. As noted, the Central Gas Control Department of UGI was transferred from Reading to Temple during 1971. We take judicial notice of the fact that Temple and Reading, Pennsylvania are approximately five miles distant from each other.

directed at colleges and universities, for the purpose, purportedly, of filling managerial positions.[22]

The absence of central direction of hiring and promotion policies is particularly clear in the case of those employees covered by the collective bargaining agreement negotiated in their behalf by Local 600. This agreement covers many crucial terms and conditions of employment, and UGI is no longer free to unilaterally change these terms and conditions, as it may for those employees who are not covered by a collective bargaining agreement. Local 600 represents *only* employees in the Reading area. Terms and conditions of employment for unionized employees in Harrisburg, Lancaster, and Lehigh are covered by the collective bargaining agreement between UGI and System Council U–22 of the International Brotherhood of Electrical Workers.

*Second,* plaintiffs have failed to show that they are adequate representatives of employees of other UGI divisions, as required by Rule 23(a)(4) of the Federal Rules of Civil Procedure. It seems unlikely that Jones and McCracken, who are not union members, or Anderson, who belongs to Local 600, can adequately represent members of System Council U–22, who are employed in separate facilities and are represented by a different labor organization.

▮ In a class action determination, the burden falls upon plaintiffs to make a positive showing that the requirements of Rule 23 are satisfied. *Philadelphia Electric Company v. Anaconda American Brass Company,* 43 F.R.D. 452, 457 (E.D.Pa.1968). Plaintiffs have failed to demonstrate that a class should extend beyond the Reading-Temple area.

This conclusion, however, is based upon the record as it now stands, and is subject to modification or amendment before a decision on the merits of the

case. See Rule 23(c)(1) of the Federal Rules of Civil Procedure; *Baxter v. Savannah Sugar Refining Corporation,* 46 F.R.D. 56, 59–60 (S.D.Ga.1969); *Hardy v. United States Steel Corporation,* 289 F.Supp. 200, 203 (N.D.Ala.1967). If, during the course of these proceedings, plaintiffs are able to demonstrate that personnel or employment policies in general, or the challenged policies in particular, emanate from corporate administrative headquarters, and are imposed upon the various operating divisions, or if they are able to make the requisite positive showing that the named plaintiffs are adequate representatives of employees at other facilities, we will reconsider the class determination. For present purposes, however, we shall limit the class to non-exempt salaried and hourly employees at the Reading and Temple facilities of UGI.

4. *The formal requirements of Rule 23(a) and 23(b).*

▮ At this stage in the litigation, therefore, we will determine the class to include all black persons who unsuccessfully sought employment at the Reading and Temple facilities of UGI from April 8, 1971 (Title VII) or November 1, 1967 (§ 1981) until the present, or who are presently employed or have been employed at the Reading and Temple facilities since April 8, 1971 (Title VII) or November 1, 1967 (§ 1981), or who may seek employment or become employed at the Reading and Temple facilities in the future.

So defined, we are satisfied that the class meets the requirements of Rule 23(a) and 23(b)(2).

a. *Numerosity.*

Rule 23(a)(1) permits a class action only if "the class is so numerous that joinder of all members is impracticable."

In the instant case, discovery has not proceeded far enough to determine the

---

22. Plaintiffs do not seek to include managerial employees, of the so-called "exempt" classification, within the class to be determined herein.

exact number of members of the class. The parties have stipulated, however, that between May of 1969 and the class action hearing in this case, 369 black persons sought employment with the company. There is nothing before us to indicate what percentage of this group sought employment at the Temple and Reading facilities; it is undisputed that these are major divisions of UGI; hence, it is plausible that a large number of these persons did seek employment at the two plants.

Further, the class also includes persons who may seek employment at Reading and Temple in the future. Plaintiffs have submitted data from the 1970 Census which tends to establish that 5744 black persons lived in the Reading area at the time that Census was prepared. Since UGI is a significant employer in the area, it is again likely that some of these persons may seek employment there in the future, particularly if plaintiffs are correct that racially discriminatory policies have existed there in the past, and eradication of such policies would increase the willingness of blacks to seek employment with the company.[23]

As the Court noted in *Local 246, Utility Workers Union of Am. v. Southern Cal. Edison Co.*, 13 FR Serv.2d 23a.2, Case 1 (C.D.Cal.1969):

> Defendant argues that as to the plaintiff Blossfeld there are only 8 persons who could constitute a class and that as to the plaintiff Farrow, only 1 other male employee is "similarly situated." He argues that neither class proposed here is of sufficient size to allow a class action.
>
> A determination as to whether members of a class are numerous enough to authorize the bringing of a class action is a matter of judicial discretion. *Rank v. Krug*, 90 F.Supp. 773 (S.D.Cal.1950).

The very nature of the Civil Rights Act [of 1964] contemplates the bringing of a class action by even a small number of discriminated against persons on behalf of all who are or may in the future be similarly situated. Its purpose is to afford a broad remedy which comes to the rescue of all persons fitting the class of the plaintiffs. A class action filed on behalf of all persons who have applied and who will apply to an employer for employment is proper under Title VII.

> Negroes who filed charges with EEOC alleging that the employer refused to hire them because of their race were allowed to maintain a class action against the employer under Title VII of the Civil Rights Act on behalf of all Negroes who have applied and will apply for jobs with the employer. *Barron v. Neco Electrical Products Corp.*, 1 FEP Cases 706, 70 LRRM 3194 (D.C.Miss.1969).
>
> This action is maintained on behalf of both individual plaintiffs and on behalf of all persons similarly situated, including persons in their situation who may in the future apply for employment and such an action is a proper class action and the ground for dismissal must fail.

13 F.R.Serv.2d at 480–481.

We agree with the reasoning of the Court in *Local 246*, and conclude that the numerosity requirement of Rule 23(a) is satisfied.

b. *Common questions of law or fact.*

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."

 In the instant case, plaintiffs allege a policy of racial discrimination in hiring, promotion, and terms and conditions of employment. As Judge (now Chief Judge) Lord stated in *Mack v.*

---

23. We emphasize that we express no view with respect to the merits of plaintiffs' claim of discrimination.

*General Electric Company,* 329 F.Supp. 72, 76 (E.D.Pa.1971):

 * * * Since a permeating policy of racial discrimination is alleged, there can be little doubt that there are questions of law and fact common to all class members and that the claims of the Negro plaintiffs that they have been discriminated against will be typical of the claims of other Negroes. If the defendant does discriminate on racial grounds, it would seem that every Negro will be affected similarly.

This "across-the-board" approach is clearly the law in this District, and was recently reaffirmed by Judge Newcomer in *Paddison v. Fidelity Bank,* 60 F.R. D. 695 (E.D.Pa.1973). While there may be some factual differences in the situations of individual class members, it would unduly restrict the remedial purposes of this civil rights legislation to fragment or dissolve a class action because of such nuances, when racial discrimination has been broadly alleged and all class members are potential victims of that discrimination.

Accordingly, we conclude that the requirements of Rule 23(a)(2) have been met.

c. *Typicality of the plaintiffs' claims.*

Rule 23(a)(3) requires that "the claims * * * of the representative parties [be] typical of the claims * * * of the class."

For the reasons discussed above, see *Mack v. General Electric Company, supra,* 329 F.Supp. at 76, we are satisfied that the claims of plaintiffs Jones and McCracken, former employees who were not union members, and Anderson, a present employee who is a union member, are typical of the claims of the class of employees which we have delineated.

d. *Adequacy of representation.*

Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class."

As the Court noted in *Wetzel v. Liberty Mutual Insurance Company, supra,* 508 F.2d at 247:

Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class. * * *

In the case at bar, we are fully satisfied with the qualifications, experience, and ability of counsel for plaintiffs and the class. Similarly, we perceive no interests of the named plaintiffs which could be antagonistic to the interests of the class which they seek to represent. Therefore, the requirements of Rule 23(a)(4) have been met.

e. *The propriety of a class action under Rule 23(b)(2).*

Finally, we conclude that plaintiffs have made a sufficient showing to maintain this class action under the provisions of Rule 23(b)(2), which permits such actions in cases (1) in which the requirements of Rule 23(a) have been satisfied, and, (2) in which "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

The Court of Appeals for the Third Circuit extensively considered the applicability in employment discrimination cases of the "(b)(2)" class action device in *Wetzel v. Liberty Mutual Insurance Company, supra,* 508 F.2d at 250–251 (footnote omitted):

 * * * [A] Title VII suit against discriminatory hiring and promotion policies is necessarily a suit to end discrimination because of a common class characteristic, in this case sex. *Bowe v. Colgate-Palmolive Co.,* 416 F. 2d 711, 719 (7th Cir. 1969); *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 499 (5th Cir. 1968). The conduct of

the employer is actionable "on grounds generally applicable to the class," and the relief sought is "relief with respect to the class as a whole." The class, all sharing a common characteristic subjected to discrimination, is cohesive as to the claims alleged in the complaint. Thus, a Title VII action is particularly fit for (b)(2) treatment, and the drafters of Rule 23 specifically contemplated that suits against discriminatory hiring and promotion policies would be appropriately maintained under (b)(2). [Advisory Committee's Note to Proposed Amendments to Rule 23, 39 F.R.D. 69, 102 (1966)]. Since a Title VII suit is essentially equitable in nature, it cannot be characterized as one seeking exclusively or predominantly money damages. *Franks v. Bowman Transp. Co.*, 495 F.2d 398 (5th Cir. 1974).

In the instant case, as in *Wetzel*, plaintiffs seek relief from alleged discrimination based on a common class characteristic; viz., race, and the class which shares his characteristic is cohesive in this respect. Since essentially the same claim is made under § 1981, the *Wetzel* analysis is equally applicable with respect to it.

Finally, the fact that plaintiffs may seek damages as well as equitable relief is no bar to the maintenance of a (b)(2) action. *Wetzel v. Liberty Mutual Insurance Company, supra*, 508 F.2d at 251; *Franks v. Bowman Transp. Co.*, 495 F.2d 398, 422 (5th Cir. 1974); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 257 (5th Cir. 1974); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1375 (5th Cir. 1974); *Robinson v. Lorillard Corp.*, 444 F.2d 791, 801–802 (4th Cir. 1971), petition for cert. dism., 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed. 655 (1972); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 720 (7th Cir. 1969); but see *Paddison v. Fidelity Bank, supra*, 7 FEP Cases at 186.

One final question remains. It appears that this action could also be certified under Rule 23(b)(3), which would require notice to the class pursuant to Rule 23(c)(2), see *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), and would permit potential class members to "opt-out" pursuant to Rules 23(c)(2) and (c)(3). Under such circumstances, *Wetzel* directs us to certify the class under (b)(2) rather than under (b)(3):

> Liberty Mutual also contends that if the requirements of both (b)(2) and (b)(3) are met, the court should certify the class under (b)(3) to provide the procedural protections, namely notice and opting out, which (b)(3) affords members of the class. Virtually every class action meeting the requirements of 23(b)(2) will also meet the less severe requirements of 23(b)(3). *Van Gemert v. Boeing Company*, 259 F.Supp. 125, 130 (S.D.N.Y.1966). If the actions are classified under (b)(3), members of the class could elect to opt out and thereby not be bound by the judgment. This would permit the institution of separate litigation and would defeat the fundamental objective of (b)(2), to bind the members of the class with one conclusive adjudication. *Van Gemert v. Boeing, Company, supra* at 130–131. As discussed above, the procedural protections of (b)(3), opting out and notice, are necessary because of the heterogeneity of the (b)(3) class. They are unnecessary for the homogeneous (b)(2) class.

*Id.*, 508 F.2d at 252–253 (footnote omitted). See also *Mattern v. Weinberger*, 519 F.2d 150 (3d Cir., 1975).

For the reasons discussed in the preceding sections of this Memorandum, we are satisfied that this action is sufficiently homogeneous to be maintained under Rule 23(b)(2), and that the notice and opting out mandated in class actions

maintained under Rule 23(b)(3) are inappropriate herein.

## CONCLUSION

Accordingly, we shall enter an Order setting forth the following in essence: (1) Clifford Anderson will be added as a plaintiff in the action; (2) Local 600 will be added as a defendant; (3) the action will be certified as a class action pursuant to Rule 23(b)(2), consisting of all black persons who unsuccessfully sought employment at the Reading and Temple facilities of UGI from April 8, 1971 (Title VII), or November 1, 1967 (§ 1981) until the present, or who are presently employed or have been employed at the Reading and Temple facilities of UGI since April 8, 1971 (Title VII), or November 1, 1967 (§ 1981), or who may seek employment or become employed at the Reading and Temple facilities of UGI in the future.[24]

In closing, we wish to say one final word about the conduct of this action to date. Jones left the employment of UGI on July 6, 1971, and filed his charge of discrimination with the EEOC the following day. This action was filed on November 1, 1973, and a right to sue letter was issued by the Acting District Director of the Philadelphia District Office of the EEOC on January 4, 1974. The proceedings in this Court have been complex and time-consuming, and counsel have diligently and competently represented their clients. The law in the area of employment discrimination is indeed complicated and often fraught with technical subtleties and nuances which include a myriad of jurisdictional hurdles; it continually evolves as precedents are established and Courts confront new factual situations requiring application of the principles which govern these actions.

The groundrules in this case, however, have now been spelled out. The broad parameters within which the action will proceed have been established. The named plaintiffs, the members of the class, and the company and union defendants, have a right to expect that the important issues which emanate from this litigation will be resolved as promptly as possible.

Accordingly, we shall set forth in the attached Order a schedule for the completion of discovery, the filing of the required pretrial documents, and the commencement of the trial itself, should that be necessary.

## ORDER

And now, to wit, this 16th day of July, 1975, it is ORDERED that:

(1) Clifford Anderson is hereby joined as a plaintiff in the above-captioned action;

(2) Local 600, Gas Fitter-Utility Employees Union, affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, be and the same is hereby joined as an additional defendant in the above captioned action; and

(3) The above-captioned action be and the same is hereby certified as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the class to consist of all black persons who unsuccessfully sought employment at the Reading and Temple facilities of the United Gas Improvement Corporation from April 8, 1971 (under Title VII of the Civil Rights Act of 1964, as amended), or November 1, 1967 (under 42 U.S.C. § 1981), until the present, or who are presently employed or have been employed at the Reading and Temple facilities of the United Gas Improvement Corporation since April 8, 1971 (under Title VII of the Civil Rights Act of 1964, as amended), or November 1, 1967 (under 42 U.S.C. § 1981), or who may

24. As we indicated *supra* at n. 22, this designation excludes managerial employment classifications.

seek employment or become employed at the Reading and Temple facilities of the United Gas Improvement Corporation in the future, said class to exclude past, present, and future employees in the "exempt" classification, that is, managerial employees.

It is further ordered that all discovery in the above-captioned action be completed by October 1, 1975; that a settlement conference be held in Chambers at 1:30 P.M. on October 16, 1975; that the Final Pretrial Order and other documents required by this Court's Standing Order of December 6, 1973, as amended October 21, 1974, be filed on or before November 6, 1975; that a Final Pretrial Conference be held in Chambers at 4:00 P.M. on November 20, 1975; and that trial commence at 10:00 A.M. on December 2, 1975.