**Carmen R. ORTIZ, Plaintiff,**

v.

**BANK OF AMERICA, Jeanne Lyons, Defendants.**

**No. Civ. S–81–298 LKK.**

United States District Court, E. D. California.

Sept. 9, 1982.

Eldora A. Gardner, San Francisco, Cal., for defendants.

M. Armando Enriquez, Carmichael, Cal., for plaintiff.

## ORDER

KARLTON, District Judge.

"No argument has ever been advanced by any reasonable man against the fact of differences among men. The whole argument is about what differences exist and how they are to be gauged." Jacques Barzun, *Race: A Study in Superstition,* 201 (1965).

Plaintiff has filed a modest lawsuit seeking damages for injury she allegedly sustained as a result of defendants' conduct towards her. Among other statutory predicates, she asserts that defendants are liable for injury under 42 U.S.C. § 1981. Defendants assert that section 1981 protects only against "racial" discrimination, and argue that since plaintiff's complaint alleges discrimination based on national origin, it must be dismissed.[1] This unpretentious beginning requires me to consider profound and complex questions of law which have given rise to a widespread debate among the federal courts. This opinion will briefly

---

1. Defendant has not favored the court with a definition of "race" nor of "national origin" nor has defendant suggested how the two are to be distinguished. As will be seen, this issue is of some significance in attempting to dispose of the motion.

trace the procedural history of the case, note the standards applicable to a defendant's motion to dismiss, and then undertake an extended examination of the cases. I then determine that neither the Supreme Court nor the Ninth Circuit Court of Appeals has directly ruled on the issues tendered by this motion. Accordingly, I will attempt to find a method of resolving the issue consistent with applicable principles and with due regard to the current scholarship in the fields of study implicated by the issue tendered.

## I

## PROCEDURAL HISTORY

Plaintiff alleges that she was employed for seventeen (17) years by defendant Bank of America as a clerk and that she was denied a promotion to the position of teller, despite being qualified for the position, solely on the basis of her Puerto Rican descent. She also alleges that she was terminated in April of 1979, by defendant Bank of America on the basis of her national origin. Finally, she alleges that the defendants subjected her to harassment due to her national origin and accent. On the basis of these factual allegations plaintiff purports to state causes of action against the defendants for violation of California Labor Code section 1418(a), Title VIII of the California Administrative Code, 42 U.S.C. § 2000e, et seq. (Title VII), 42 U.S.C. § 1981, breach of contract, and negligent and intentional infliction of emotional distress.[2]

The matter is now before the court on the defendants' motion to dismiss or in the alternative to strike and for a more definite statement. Specifically, defendants move to dismiss on the following grounds: (1) Plaintiff fails to state a cause of action under 42 U.S.C. § 1981; (2) the court lacks

jurisdiction over plaintiff's claim in that exclusive jurisdiction over said claim is with the Workers Compensation Appeals Board; (3) plaintiff's emotional distress cause of action is barred by the statute of limitations. In addition, defendants have moved to strike plaintiff's DOE allegations and her claim for compensatory and punitive damages claims on the causes of actions based upon Title VII and the California Fair Employment and Housing Act. Finally, in the alternative defendants move for an order requiring a more definite statement from plaintiff. This published opinion will be limited to a consideration of the motion to dismiss for failure to state a claim under 42 U.S.C. § 1981.[3]

I begin by enunciating the well established standards by which defendants' motion must be judged.

## II

## MOTION TO DISMISS STANDARD

■ In considering a motion to dismiss, the allegations of the complaint in question must be accepted as true. *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Hospital Building Co. v. Rex Hospital Trustees,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 834 (9th Cir. 1980). Moreover, in evaluating the complaint the court is to construe the complaint in the light most favorable to the pleader and all doubts are to be resolved in the pleader's favor. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); *Gillespie v. Civiletti,* 629 F.2d 637, 640 (9th Cir. 1980); *Amfac Mortgage Corp. v. Arizona Mall of Tempe,* 583 F.2d 426, 430 (9th Cir. 1978). Finally, a complaint may not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt

---

**2.** This action was originally filed by plaintiff in Placer County Superior Court. Defendants removed the action to this court pursuant to 28 U.S.C. § 1441(a) which provides for the removal of any action brought in the state courts over which the United States District Courts have original jurisdiction.

**3.** The other issues will be disposed of in an unpublished companion opinion. My reasons for so limiting the published opinion are set forth in *Kouba v. Allstate Ins. Co.,* 523 F.Supp. 148, 151 n.2 (E.D.Cal.1981).

that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957); *see also, Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Gillespie v. Civiletti,* 629 F.2d at 640; *Ernest W. Hahn, Inc. v. Codding,* 615 F.2d at 834; *Amfac Mortgage Corp. v. Arizona Mall of Tempe,* 583 F.2d at 429. In essence, as the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir. 1978), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). It is against these procedural standards which defendants' motion must be measured.

## III

## RACE AND SECTION 1981 CLAIMS

As noted above, plaintiff alleges that she was discriminated against in employment by the defendants on the basis of her Puerto Rican descent and accent. Based on this allegation plaintiff seeks relief pursuant to 42 U.S.C. § 1981. Defendants have moved to dismiss plaintiff's section 1981 claim for failure to state a cause of action. Specifically, defendants argue that plaintiff's action is one based upon claims of national origin discrimination and that section 1981's protections are limited to those charging racial discrimination. In sum, defendants assert, plaintiff's claim of national origin discrimination is not within the scope of section 1981 and should be dismissed (*see* n.1 supra).

Thus, in this respect, the defendants' motion presents the single issue of whether an allegation of discrimination on the basis of Puerto Rican descent and accent is sufficient to state a claim under 42 U.S.C. § 1981. While this issue may appear on first blush to be relatively straightforward, it in fact lies at the heart of an open, and sometimes confusing, debate taking place in the lower federal courts regarding the appropriate scope of section 1981.

### A. *The Statute*

The question tendered is whether 42 U.S.C. § 1981 prohibits discrimination under the allegations of the complaint. Initially then, the court is faced with a question of statutory construction and, accordingly, I must first turn to the text of the statute. *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981). Section 1981 provides as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The statute's language is of extraordinary breadth. It does not speak in terms of race, religion or nationality but, on the contrary, speaks of "all persons." It is hard to imagine what broader language the Congress could have adopted.[4] Although it is true that "the plain meaning rule is 'rather an axiom of experience than a rule of law . . . .' [Citation omitted]." *Watt v. Alaska,* 451 U.S. at 266, 101 S.Ct. at 1681, it

---

**4.** It is true that section 1981 provides that "all persons" shall have the rights and benefits of "white citizens," however, the latter phrase has been found by the Supreme Court not to limit the scope of those who fall within section 1981's protection. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 286–96, 96 S.Ct. 2574, 2581–83, 49 L.Ed.2d 493 (1976) (holding that section 1981 prohibits racial discrimination in private employment against

whites as well as non-whites). Nonetheless, the Court has viewed the phrase as emphasizing the "racial character of the rights being protected." *Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. at 287, 96 S.Ct. at 2582. This reading, and the difficulties arising therefrom, will be discussed in the following pages.

is also true that "[t]he language of a statute is the best and most reliable index of its meaning, and where the language is clear and unequivocal it is determinative of its construction." *Smith v. Califano,* 597 F.2d 152, 155 (9th Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979) *quoting Monte Vista Lodge v. Guardian Life Ins. Co.,* 384 F.2d 126, 128 (9th Cir. 1967), *cert. denied,* 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1142 (1968). The statute's apparent breadth and clarity, however, has been clouded by subsequent case law. Moreover, it has been suggested that Congress intended to exclude at least some persons from the ambit of its protection. See *Runyon v. McCrary,* 427 U.S. 160, 167, 96 S.Ct. 2586, 2592, 49 L.Ed.2d 415 (1976). Under such circumstances it appears wholly appropriate to look to the circumstances of enactment and legislative history for clarification. *See e.g. Heppner v. Alyeska Pipeline Service Co.,* 665 F.2d 868, 871–72 (9th Cir. 1981); *Consortium of Community Based Organizations v. Donovan,* 530 F.Supp. 520, 527 (E.D.Cal.1982).

B. *Background and Legislative History of § 1981*

Section 1981, in its original form, was part of section 1 of the Civil Rights Act of 1866. The statute was passed pursuant to Congress' authority to enforce the then recently enacted thirteenth amendment. At the time the authority of Congress to enact the Civil Rights Act of 1866 pursuant to the thirteenth amendment was subject to some doubt. Those doubts lead to a flurry of activity including the eventual passage of the fourteenth amendment and the reenactment of the Civil Rights Act of 1866.[5]

The legislation was enacted in the aftermath of the Civil War. Among the major

reasons for its adoption was a desire to nullify the effects of the Black Codes of the southern states and mistreatment of blacks by private individuals. *See generally,* M. Konvitz, *A Century of Civil Rights,* 12–17 (1961); Comment, *Developments in the Law—Section 1981,* 15 Harv.C.R.—C.L.L. Rev. 29, 37–42 (1980); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 427–28, 88 S.Ct. 2186, 2197, 20 L.Ed.2d 1189 (1968). Nonetheless, throughout the debates on both the adoption of the Civil Rights Act of 1866 and the thirteenth amendment itself Congress manifested a much broader purpose. Congress had before it reports of the deprivation of civil rights suffered both by Northern whites and, indeed, by poor Southern whites. There appears to be no question that in passing the acts Congress meant to protect their rights as well. *See* J. ten Broek, *Equal Under Law* 164, 168, 179–81 (1965).

Although the plight of the freed man was a primary focus of the congressional debate, arguments for the bill were often phrased in more general terms indicative of an intent to secure the same civil rights for all persons within the United States. Thus, the bill was introduced by Senator Trumbull of Illinois as a "bill ... to protect *all persons* in the United States in their civil rights ..." Cong.Globe, 39th Congress, 1st Sess., 211 (1866) (emphasis added). Moreover, the bill was initially described by Senator Trumbull as being applicable to "every race and color." *Id.; see also McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 288 n.19, 96 S.Ct. 2574, 2582 n.19, 49 L.Ed.2d 493 (1976). In the same vein, Representative Wilson of Iowa argued that the purpose of the bill was to secure "the equality of citizens ... in the enjoyment of 'civil rights and immunities.'" Cong.Globe, 39th

---

**5.** The statute was reenacted pursuant to the fourteenth amendment as part of the Enforcement Act of 1870. The statutes of the United States were revised and recodified in 1874, at which time section 1981 appeared in its present form for the first time. For a more detailed description of the passage, reenactment and recodification of the statute *see, Jones v. United Gas Improvement Corp.,* 68 F.R.D. 1, 10–11 (E.D.Pa.1975), and Comment, *Developments in*

*the Law—Section 1981,* 15 Harv.C.R.—C.L.L. Rev. 29, 35–36 (1980). The authority of Congress under the thirteenth amendment to enact such legislation has subsequently been confirmed by the Supreme Court. *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 439–41, 88 S.Ct. 2186, 2203, 20 L.Ed.2d 1189 (1968); *Runyon v. McCrary,* 427 U.S. 160, 179, 96 S.Ct. 2586, 2598, 49 L.Ed.2d 415 (1976).

Cong., 1st Sess. at 1117. Moreover, Representative Wilson assured that the bill would "secure[ ] to citizens of the United States equality in the exemptions of the law .... Whatever exemptions there may be shall apply to *all citizens alike.* One race shall not be more favored in this respect than another," *Id.* (emphasis added). Finally, Wilson lobbied for passage of the bill on the basis that it would "protect our citizens, from the highest to the lowest, from the whitest to the blackest, in the enjoyment of the great fundamental rights which belong to all men." *Id.* at 1118. During the debate over the Act repeated references were made to the application of the bill's protections to all citizens "of every race and color." *See* Senator Trumbull's introduction at Cong.Globe, 39th Congress, 1st Sess., at 211; remarks of Senator Howard, *Id.* at 504; remarks of Senator Hendricks, *Id.* at 601; remarks of Representative Shallabarger, *Id.* at 1293.[6]

Indeed it was the very breadth of Congress' intent, as embodied in the language of the proposed statute which led to the amendment of the bill to include the phrase "as is enjoyed by white citizens." This amendment was proposed by Representative Wilson upon the bill's introduction and was intended to "perfect" the legislation. Cong.Globe, 39th Cong., 1st Sess. at 1115. Representative Wilson stated during the debates that the reason for the amendment was that "it was thought by some persons that unless these qualifying words were incorporated in the bill, those rights might be extended to all citizens, whether male or female, majors or minors." *Id.* at 157. This aspect of the legislative history has been read to emphasize the statute's "racial character" and may suggest to some that

Congress did not mean to include women or minors among "all persons," (*see McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. at 293, 96 S.Ct. at 2585). Whether or not this suggestion is correct it seems quite clear that Congress did not mean to protect only blacks. *Id.* Clearly, Congress was primarily addressing the plight of the recently freed blacks—a not surprising concern given the context in which Congress acted in 1866. Nonetheless, the legislative history indicates that (perhaps except for distinctions based on gender and age) Congress intended to ensure that all citizens were to enjoy the same civil rights.

This examination of the legislative history was undertaken to determine what, if any, light it throws on the question of whether the words "all persons" in section 1981 were in some fashion limited so as to exclude claims for injury resulting from so-called national origin discrimination. As I discuss in section IV, *infra,* all population classifications are essentially arbitrary and have significance only in terms of the purpose of classification. Any division of population which is not itself based on gender or age, will inevitably include persons of both sexes and all ages. Thus even if the legislative history is correctly read to exclude women and minors, it in no way suggests as a logical matter that other exclusionary criteria (for instance, a distinction between race and national origin) may exist. Critical to understanding this point is an appreciation of the taxonomic function which is explored in Section IV, *infra.* Despite this fact, however, it has been argued that the exclusion of some people from "all persons" raises an ambiguity as to congressional intent.[7] In any event, as I have

---

6. The legislative history of the Civil Rights Act of 1866 contains other remarks relevant to the question of whether Congress intended to distinguish between race and national origin. At several points in the amendment and debate process the recently freed slaves were referred to not as blacks but rather as those "of African descent." *See* Senator Trumbull's remarks at Cong.Globe, 39th Cong., 1st Sess. at 474 and 14 Stat. 27 (discussed in *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. at 288 n.19, 96 S.Ct. at 2582 n.19).

7. In this regard, the courts and commentators alike have questioned whether the immediate concerns of Congress over one hundred years ago should determine the construction of section 1981 today. Those who have criticized this approach argue that Congress passed the Civil Rights Act of 1866 in the year following the Civil War in an attempt to make the recognition of all citizen's civil rights a permanent fixture in the legal system which governs our society. Thus although the 1866 Congress focused upon the nation's most oppressed group,

noted, although not explaining what is meant, the Supreme Court has assured us that the statute's protection is racial in character. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. at 293, 96 S.Ct. at 2585. I now turn to the cases to see how that characterization has affected the national origin issue.

## C. *Judicial Interpretation of § 1981*

### 1. *Binding Precedent*

First, of course, I must consider the decisions of those higher courts by whose decisions I am bound. Unfortunately, and surprisingly, neither the Supreme Court nor the Ninth Circuit Court of Appeals has expressly ruled on the question of the scope of section 1981 with regard to any purported distinction between national origin and racial discrimination claims.

While the Supreme Court has never ruled on the issue presented by this motion, nonetheless, its decisions contain repeated dicta characterizing the scope of section 1981 protection in terms of "racial" equality. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. at 287, 96 S.Ct. at 2582 (holding that white persons may state a claim under section 1981 and noting " 'the racial character of the rights being protected' "); *see also Jones v. Alfred H. Mayer Co.,* 392 U.S. at 413, 88 S.Ct. at 2189 ("the statute in this case [§ 1982] deals only with racial discrimination and does not address itself to discrimination on the grounds of religion or national origin."); *Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966).[8]

Two observations about this dicta seem appropriate. First, the Court has never undertaken to explain what it meant by "race" in this context. Second, the reason for this failure is obvious. In each of the cases in which the Court has referred to the "racial character" of the rights protected the claim being considered was either that of a black litigant or, in the case of *McDonald,* a white plaintiff. Thus, whatever "race" may mean, these claims involved the very groups of people explicitly referred to by Congress during the debates as intended beneficiaries of the statute. Given that the Supreme Court has not addressed the issue before this court, it is hardly surprising that the Court has not discussed whether there is any distinction between "race" and "national origin."[9] Thus, although the Su-

the recently freed blacks, it is argued that the courts should interpret the scope of section 1981 to effectuate those principles of equality in civil rights which motivated the Congress and apply the statute to the forms of discrimination which plague our society today and which the 1866 Congress could not specifically address. *See* Levinson, *Reviewed—New Perspectives on the Reconstruction Court,* 26 Stan. L.Rev. 461, 481–83 (1974) Developments in the Law—Section 1981, *supra* at 48–49 and 68–69. *See also Runyon v. McCrary,* 427 U.S. at 191, 96 S.Ct. at 2604 (Justice Stevens concurring) ("For even if *Jones* did not accurately reflect the sentiments of the Reconstruction Congress, it surely accords with the prevailing sense of justice today"). For reasons which are expressed infra, *see,* Section IV, it is my view that the courts have no choice; as I will explain the notion of "race" is a dynamic concept which compels addressing the question in terms of the reality of present day group-to-group relations.

**8.** As observed above, section 1981 and section 1982 both have their origin in section 1 of the

Civil Rights Act of 1866. Nonetheless, in their present form there are certain cognizable distinctions between the two sections. Foremost of those differences is the fact that section 1981 does not contain the citizenship requirement found in section 1982 and thus its protections are not limited to citizens of the United States. *See Takahashi v. Fish and Game Commission,* 334 U.S. 410, 419–20, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948) (section 1981 protects all persons from discrimination on the basis of "alienage or color"). With these limitations, then, *Jones* is pertinent to the determination of the proper scope of section 1981.

**9.** To say that the Supreme Court has not explained the difference between national origin and race, of course, does not end the discussion or, indeed, end this court's duty. As a subordinate court my role is to apply the law as pronounced by the Supreme Court, and in attempting to do so it is my duty to consider that Court's dicta. As I explain in Section IV, *infra,* however, the notion of race is not static—but dynamic. Within a given context the notion of

preme Court has made reference to the "racial character" of the rights protected by section 1981 that dicta clearly does not resolve the issue posed by the pending motion.[10] *See, Carridi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir. 1977).

The Ninth Circuit has likewise failed to address the issue presently before me in any substantive fashion. It cannot be said, however, that the court of appeals has not had the opportunity to authoritatively rule, since the court has had before it cases in which the facts suggested this very issue. I will now examine the Ninth Circuit cases for such teaching as may be gleaned from its opinions.

In *Agnew v. City of Compton,* 239 F.2d 226 (9th Cir. 1956), *cert. denied,* 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (1957), the circuit for the first time considered the appropriate scope of section 1981. Plaintiff there simply alleged that certain police conduct involved in his arrest violated his rights secured by the Constitution and federal statutes including sections 1981, 1982. Plaintiff did not allege that he was of any particular race, any specific national origin, or any other distinctive population group. In this context the Ninth Circuit affirmed the district court's judgment in the defendants' favor on the section 1981 and 1982 claims, stating:

> The statutes next referred to are 42 U.S.C. §§ 1981 and 1982. These are the first two sections of the Civil Rights Act, as now codified. The plain purpose of these statutes is to provide for equality of rights as between persons of different races. The complaint under review does not allege that appellant was deprived of any right which, under similar circumstances, would have been accorded a person of a different race. It follows that no cause of action is stated under these sections.

239 F.2d at 230; *see also Olivares v. Martin,* 555 F.2d 1192, 1196 (5th Cir. 1977). This observation that section 1981 is intended to provide equality between "different races," like the Supreme Court's dicta, provides little guidance in resolution of the issue presently before me. Thus the *Agnew* Court, as in the Supreme Court cases noted above, did not attempt to define the word "race" nor did it provide a distinction between race and national origin.[11]

In the years following the *Agnew* decision the Ninth Circuit has been presented with a number of cases in which plaintiffs alleging membership in distinctive groups of the population brought suit pursuant to section 1981. In each of these cases the district court had either dismissed the complaint or entered judgment in favor of the defendants. In each instance the circuit court reversed and allowed the plaintiff to sue under section 1981 without any discussion of whether the claims involved discrimination on the basis of race or national origin or of whether such distinction could be made. *See Scott v. Eversole Mortuary,* 522 F.2d 1110 (9th Cir. 1975) (holding that

race, whether viewed from the perspective of history, biology or linguistics, may encompass the notion of national origin.

10. Other Supreme Court decisions involving section 1981 are, however, of note, although again they do not directly address the issue tendered by this motion. Of primary importance is *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493, in which the Court held that section 1981 is applicable to racial discrimination in private employment against white persons. This holding was based primarily upon the Court's interpretation of the legislative history of the Civil Rights Act of 1866 as compelling the conclusion that section 1981's protections were intended to extend to all persons including white persons. 427 U.S. at 287–96, 96 S.Ct. at 2582. The Supreme Court has also held that section 1981 is applicable to aliens and that aliens of "certain racial and color groups" may not be discriminated against under that statute. *Takahashi v. Fish and Game Commission,* 334 U.S. at 419–20, 68 S.Ct. at 1142; *Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971). Finally, the Court has indicated that section 1981 does not apply to claims of gender based or religious discrimination. *Runyon v. McCrary,* 427 U.S. at 167, 96 S.Ct. at 2592.

11. Again, it is not surprising that the court did not address these issues since they were not presented under the facts of the *Agnew* case.

American Indian plaintiffs had appropriately pled a claim under section 1981); *Sethy v. Alameda County Water District,* 545 F.2d 1157 (9th Cir. 1976) (en banc) (holding by implication that plaintiff, "a brown-skinned person of East Indian descent," had stated a proper claim under section 1981); *Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977), *vacated as moot,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (allowing claims of discrimination in employment by both blacks and Mexican-Americans under section 1981 with no discussion of whether the Mexican-American plaintiffs had stated a cause of action under the statute).[12] Although these cases do not directly dispose of the issue presented, they appear to indicate that the circuit court has recognized that "national origin claims" may state a cognizable claim of discrimination under section 1981.[13]

On one occasion the Ninth Circuit has specifically recognized the issue now before this court but did not resolve it. In *Gonzalez v. Stanford Applied Engineering Inc.,* 597 F.2d 1298 (9th Cir. 1979), the appellant brought suit alleging that he was the victim of employment discrimination due to his Mexican descent, and further alleging that such discrimination was a violation of section 1981.[14] The district court entered summary judgment on the section 1981 claim on the grounds that it was a claim of discrimination based upon national origin rather than on race and was therefore outside the scope of the statute. In a per curiam opinion the Ninth Circuit reversed that portion of the lower court's decision. The circuit court apparently held that, even assuming arguendo the district courts' limitations on the scope of section 1981 protection, the moving party was not entitled to summary judgment. Specifically, the circuit court stated:

> We read this as a claim that the discrimination he suffered was directed at those Mexican-Americans having, by virtue of their descent, a brown rather than a white skin.

> We take note of the fact that a substantial portion of the Mexican population traces its roots to a mixture of the Caucasian (Spanish) and native American races. With this background prejudice towards those of Mexican descent having a skin color not characteristically Caucasian must be said to be racial prejudice under § 1981. The affidavit of appellant sufficiently claimed discrimination in employment founded upon such racial prejudice. Whether this was in truth the cause for appellant's grievances remained an issue for trial and it was error to grant summary judgment upon the § 1981 claim.

597 F.2d at 1300. Prior to reaching the merits of the appeal the circuit court recognized, but did not rule upon, the issue of

---

12. The Ninth Circuit Court of Appeals is not alone in having permitted Hispanics (*see* n. 16 & 18, *infra*), or plaintiffs of other national origins, to state a claim under section 1981 without discussing whether those groups came within the statute's protection. *See Alvarado v. El Paso Independent School District,* 445 F.2d 1011 (5th Cir. 1971) (per curiam reversal of the district court recognizing that Mexican-American plaintiffs in alleging "racial and ethnic discrimination" had stated a cause of action under section 1981); *Chicano Police Officer's Assoc. v. Stover,* 526 F.2d 431 (10th Cir. 1975) *vacated on other grounds,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976); *see also Hernandez v. Erlenbusch,* 368 F.Supp. 752 (D.Or.1973) (allowing Mexican-American plaintiffs to bring an action under section 1981 on the basis that tavern keeper's policy of not allowing customers to speak languages other than English amounted "to patent racial discrimination" with no discussion of whether a distinction may be drawn between national origin and racial discrimination); *League of United Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal.1976) (allowing section 1981 claim by Mexican-American plaintiffs with no discussion of this issue).

13. As I will discuss in more detail below, it is this court's belief that the terms "race" and "national origin" are incapable of mutually exclusive definitions which are other than purely arbitrary.

14. Appellant also alleged that defendants' conduct violated Title VII. The district court granted the defendants' motion for summary judgment on the grounds that the Title VII action was not brought in a timely fashion. The court of appeals affirmed that part of the lower court's judgment.

whether a claim of national origin discrimination is itself cognizable under section 1981. The Court noted that:

Courts are divided upon the question whether prejudice based only on national origin presents a claim under § 1981. *Compare, e.g., Manzanares v. Safeway Stores, Inc.,* 593 F.2d 968 (8th Cir. 1979) [sic] *with Budinsky v. Corning Glass Works,* 425 F.Supp. 786 (W.D.Pa.1977).

597 F.2d at 1299 n.1.

Clearly then, in *Gonzalez* the court was not passing upon the issue of whether national origin discrimination claims are actionable under section 1981, nor did the Court provide a means for distinguishing between "race" and "national origin" claims. *Gonzalez,* then, must be read as a case in which the Ninth Circuit held that assuming arguendo the district court properly limited the scope of section 1981, it was inappropriate for the lower court to grant summary judgment since the record indicated that the Mexican-American plaintiffs had presented evidence that the alleged discrimination was based upon racial prejudice.[15] Thus, I conclude that neither *Gonzalez* nor any other Ninth Circuit case research has discovered is dispositive of the issue before me. Accordingly, I turn to non binding authority.

### 2. *Other Case Law*

A review of the cases in which plaintiffs have sought to state claims pursuant to section 1981 founded upon national origin reveals that the law in this area is in a state of profound disarray. Particularly in the last five years various federal district and circuit courts have engaged in a very lively, and sometimes perplexing, debate over the proper scope of section 1981. In many instances actions by Hispanic [16] plaintiffs have prompted the hottest debate and the most widely inconsistent determinations as to section 1981's scope.

As in *Gonzalez* a number of courts, while recognizing the ongoing debate as to the appropriate scope of section 1981, have found that in the case before them it was unnecessary to decide the issue due to the availability of an alternative basis for their decision. *See Vasquez v. McAllen Bag & Supply Co.,* 660 F.2d 686, 687 & n.1 (5th Cir. 1981) (In the context of a claim of national origin discrimination by a Mexican-American the court stated "[a]ssuming, arguendo, that the plaintiff's suit does state a section 1981 cause of action [he failed to submit evidence of a discriminatory purpose]."); *Guardians Association of New York City v. Civil Service Commission,* 633 F.2d 232, 268 n.67 (2d Cir. 1980) ("We also need not address, and we therefore express no opinion on, the question of the applicability of § 1981 to charges of discrimination against Hispanics."); *Garcia v. Gloor,* 618 F.2d 264, 271 n.7 (5th Cir. 1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981) (stating that the court need not decide in this case whether section 1981 "protects those who are denied these rights because they are Hispanic-Americans."); *Cariddi v. Kansas City Chiefs Football Club Inc.,* 568 F.2d at 88 (Court determined that plaintiff was not discriminated against on the basis of his national origin. In doing so the court

**15.** At least one commentator has suggested that *Gonzalez v. Stanford Applied Engineering Inc.,* 597 F.2d 1298 (9th Cir. 1979), may stand for the proposition that Hispanic plaintiffs (*see* n.16 & 18) may state a claim pursuant to section 1981 but that they must amend their complaints and demonstrate at trial that the alleged discrimination was in some fashion "racial." Developments in the Law—Section 1981, *supra* at 86 n.102. As stated above, I do not believe that *Gonzalez* should be read in that manner. Rather, I believe that the court in that case limited its decision to the facts of that case and recognized, but did not state an opinion on, the issue that is before me now.

**16.** I am using this term, which is only questionably descriptive, because it has been used by many of the courts addressing this issue. As I will discuss more fully later in this opinion, I have serious doubt that race can be defined in contradistinction from national origin in any meaningful fashion. The difficulties in defining race often present themselves in attempting to define such terms as "Hispanic." For instance, is someone of native Indian descent who comes from present day Mexico a Hispanic? Even more importantly, should the government or the courts be in the business of "certifying" bloodlines and races?

noted the split in authority as to when national origin claims were cognizable under section 1981). Despite this frequent resort to the technique of confession and avoidance, many courts have been required to address the issue presented by this motion. Below I will attempt to summarize the approaches which those courts have taken and I will attempt to articulate the problems raised by each of the various approaches. Recognizing the dangers which arise from generalizing, I believe that three general approaches may be discerned from the opinions.

Some courts when presented with this issue have concluded that section 1981 does not provide a cause of action for "national origin" discrimination. Most of these courts have concluded that the particular plaintiff was not a member of a racial group distinct from "whites," and because "whites" may not claim racial discrimination by other "whites," they were attempting to allege national origin discrimination claims, which were held not cognizable under the statute.[17] *See Hiduchenko v. Minneapolis Medical & Diagnostic Ctr.,* 467 F.Supp. 103, 106 (D.Minn.1979) (Holding that a plaintiff of Ukranian descent was not of a race other than caucasian and therefore could not state a claim for racial discrimination under section 1981 against other caucasians); *Vera v. Bethlehem Steel Corp.,* 448 F.Supp. 610, 613 (M.D.Pa.1978) (Holding that although Puerto Rican plaintiffs may have "undergone a discrimination like unto racial discrimination" they may not state a cause of action for racial discrimination under section 1981); *Jones v. United Gas Improvement Corp.,* 68 F.R.D. 1, 10–15 (E.D.Pa.1975) (claim of discrimina-

tion against Spanish surnamed persons must be characterized as a claim based upon national origin and therefore not cognizable under the statute); *see also, Avigliano v. Sumitomo Shoji America, Inc.,* 473 F.Supp. 506, 513–14 (S.D.N.Y.1979), *aff'd in part, modified in part,* 638 F.2d 552 (2d Cir.), *cert. granted,* 454 U.S. 962, 102 S.Ct. 501, 70 L.Ed.2d 377 (1981).

I find this first approach to the problem particularly troubling due to its ipse dixit analytical mode. For the most part the only analysis undertaken by the courts who have utilized this approach is to conclude, usually on the basis of the examination of the legislative history undertaken in *Jones v. United Gas Improvement Corp.,* 68 F.R.D. 1, that section 1981 extends only to claims of racial discrimination. The courts have then concluded that the particular plaintiff at issue was not of a different "race" than the alleged discriminators and thus could not state a claim under section 1981. In none of these cases have the courts attempted to define the term "race" nor have they attempted to outline a rational distinction between race and national origin. Thus, at the heart of each of these cases is an unarticulated and suppressed definition of what the particular court believed "race" to be. As will be seen below, the notion of "race" as contrasted with national origin is highly dubious. In short, these cases do not provide an analysis as to the proper scope of section 1981 but, rather, reflect only conclusions. Those conclusions, being based on faulty if unexpressed premises, are unsupportable. As such, this court finds that those cases do not represent a helpful, or appropriate, mode of analysis for the resolution of the issue presented here.[18]

---

**17.** A number of other courts, in response to allegations of national origin discrimination under section 1981, have simply dismissed the action on the basis that because there was no allegation of racial discrimination a section 1981 cause of action had not been stated. *See National Association of Government Employees v. Rumsfeld,* 413 F.Supp. 1224, 1228 (D.D. C.1976), *aff'd mem.,* 556 F.2d 76 (D.C.Cir.1977); *Martinez v. Bethlehem Steel Corp.,* 78 F.R.D. 125, 129 (E.D.Pa.1978); *Gradillas v. Hughes*

*Aircraft Co.,* 407 F.Supp. 865, 867 (D.Ariz. 1975).

**18.** The unexpressed supposition of these courts that there is a meaning for the word "race" which distinguishes that notion from national origin classifications is both common and plainly false. "Through overuse and vague application the term race has become . . . encumbered with contradictory and imprecise meanings . . . . Many people take for granted that they know what 'race' means and assume that scientific investigation has long ago proved the

A second approach, adopted by many courts, allows Hispanic plaintiffs and those of other ethnic groups to state a claim under section 1981 sufficient to survive a motion to dismiss. Nonetheless, these courts have required the plaintiffs to amend their complaints to allege "racial" discrimination and/or to bear the burden of producing evidence that the alleged discrimination was of a "racial," as opposed to a national origin, character. *See, Bullard v. OMI Georgia, Inc.,* 640 F.2d 632, 634 (5th Cir. 1981) (recognizing that the distinction between national origin and racial discrimination is an extremely difficult one to trace and holding that plaintiff's allegations of racial discrimination were sufficient to survive a motion to dismiss); *Khawaja v. Wyatt,* 494 F.Supp. 302, 304–05 (W.D.N.Y. 1980) (section 1981 action brought by plaintiff of Pakistani descent held to survive summary judgment on basis that record reflected a disputed issue of fact as to whether alleged discrimination was racial in character); *Saad v. Burns International Security Services, Inc.,* 456 F.Supp. 33, 37 (D.D.C.1978) (Plaintiff of Arabian descent allowed to amend section 1981 complaint to allege discrimination on the basis of race or color); *Apodaca v. General Electric Co.,* 445 F.Supp. 821, 823–24 (D.N.M.1978) (Spanish surnamed plaintiff granted leave to amend complaint pursuant to section 1981 to allege discrimination motivated by racial perception and animus); *Martinez v. Hazelton Research Animals, Inc.,* 430 F.Supp. 186, 188 (D.Md.1977) (Hispanic plaintiff granted leave to amend to "allege adequately [his] racial background"); *Gomez v. Pima County,* 426 F.Supp. 816, 819 (D.Ariz.1976) (Mex-

ican-American plaintiffs allowed to state a section 1981 claim for discrimination on the basis of race and color); *Cubas v. Rapid American Corp., Inc.,* 420 F.Supp. 663, 665–66 (E.D.Pa.1976) (Cuban-American plaintiff's section 1981 action survived motion to dismiss on grounds that court could not determine as a matter of law that the alleged discrimination did not contain elements of racial discrimination).

Unlike most of the first category of cases, many of the courts utilizing this second approach recognize some difficulty in, if not the futility of, attempting to distinguish between discrimination on the basis of race and on the basis of national origin. *See Bullard v. OMI Georgia, Inc.,* 640 F.2d at 634; *Khawaja v. Wyatt,* 494 F.Supp. at 305 n.1; *Apodaca v. General Electric Co.,* 445 F.Supp. at 823; *Cubas v. Rapid American Corp., Inc.,* 420 F.Supp. at 666 n.2 (looking for aid in Equal Protection cases to resolve the difficulty, without success). Despite recognizing the possible flaw in drawing a distinction between "race" and "national origin" discrimination, the courts following the second approach nonetheless recognize the distinction. For the most part they then place the burden on plaintiff of demonstrating that the alleged discrimination was of a "racial," as opposed to "national origin," character. It has been suggested that under this mode the plaintiff must meet the burden of proving "racial animus" as the motivating factor of the discrimination or of some "objective" display of the plaintiff's "racial background." *See* Developments in the Law—Section 1981, *supra* at

existence of significant human racial differences—yet, each time the term is applied, a definition must be provided so that the reader will know what concept it represents." S. Molnar, *Races, Types & Ethnic Groups,* 12 (1975) (hereinafter Molnar). Nor is the assumption limited to courts. As has been said "Geneticists believe that anthropologists have decided what a race is. Ethnologists assume that their classifications embody principles which genetic science has proved to be correct." L. Hogben, *Genetic Principles in Medicine and Social Science,* 122–44 (1931). As will be discussed infra, they are wrong. Indeed even the suppressed predicate that "scientists" would not

classify Hispanics as a "racial" type (whatever definition is used) is factually wrong. The most respectable scientists who persist in attempting a taxonomy of human types published a racial classification of thirty types, number twenty-eight of which was "Ladino" (defined as what has commonly come to be known as "Hispanics"). C. S. Coon, S. Garn & J. Birdsell, *Races: A Study of the Problems of Race Formation in Man,* 138 (1950). *See also* Massey, *Hispanic Residential Segregation, Sociology and Social Research,* 311–22 (April 3, 1981) (wherein Hispanics are referred to as "ethnic/racial" groups).

89.[19] I find it ironic that these cases which place the burden on plaintiff to prove that the alleged discrimination was of a "racial character" fail to attempt to define the term "racial" or to distinguish in any principled way that term from "national origin." To that degree this second category of cases shares the ipse dixit nature of the cases in the first category. For the same reasons as set forth above I therefore find this second approach inappropriate in resolving the pending issue.

The third category of cases are those in which the courts have found that the scope of section 1981 cannot be limited by any strict notion of "race." Rather, the courts utilizing this approach have either explicitly or implicitly found that the line between racial and national origin discrimination may not exist. Thus, for the most part these courts have looked to the "practical needs and logical reasons" underlying section 1981 in determining its appropriate scope. The result has been that many of these courts have sought to determine whether the plaintiff was a member of an identifiable group which is distinguishable from "white persons". Other courts have attempted to ascertain, regardless of any "objective" definition of race and without questioning the existence thereof, whether the discrimination alleged was based upon "racial animus." In any event, the cases applying this third approach abandon a rigid distinction between race and national origin and attempt to determine the "racial character" of the allegations in a more practical manner.[20] Thus many of the courts in this third category conclude that plaintiffs state a valid claim under section 1981 regardless of whether their claim is characterized as one of national origin, race, alienage or ethnicity. *See Manzanares v. Safeway Stores, Inc.,* 593 F.2d 968, 970–72 (10th Cir. 1979) (holding that plaintiff who alleged discrimination on the basis of his Mexican-American descent had stated a valid claim under section 1981); *Madrigal v. Certainted Corp.,* 508 F.Supp. 310, 311 (W.D.Mo.1981) ("Section 1981 should be

**19.** As will be discussed *infra,* it is indeed hard to know what such an objective characteristic might be. Recognizing that skin pigmentation is in itself so variable within "racial types" as to be meaningless (*see* n.22, *infra* ), scientists have resorted to everything from blood types (*see* Molnar, *supra* at 103; A. Montagu, *Man's Most Dangerous Myth,* 280–90 (1964) (hereinafter Montagu) through skull size and shape. Molnar, *supra* at 11, 19, 55. Each such "system" has failed to provide meaningful and consistent distinctions. Aside from the appalling notion that section 1981 actions might be resolved by the measurement of the plaintiff's skull before a jury, such "objective criteria," if any were even discovered, would be irrelevant to the purpose of section 1981. The purpose of section 1981 was to end invidious discrimination which resulted in the deprivation of civil rights among the peoples in this country. The fact that women and minors may have been excluded in no way suggests that other groups were likewise to be excluded. *See* section III, B, *supra.*

**20.** More expansive interpretations of the scope of section 1981 may be found in cases not included in this third category. For instance, one court has held that in the same fashion that section 1981 protects aliens from discrimination it protects Mexican-American's from discrimination on the basis of their "ethnic heritage." *Sabala v. Western Gillette, Inc.,* 362 F.Supp. 1142, 1147 (S.D.Tex.1973) (dicta), aff'd

*in part on other grounds, rev'd in part,* 516 F.2d 1251 (5th Cir. 1975), *vacated and remanded,* 431 U.S. 951, 97 S.Ct. 2670, 53 L.Ed.2d 268 (1977). Another interpretation of the appropriate scope of section 1981 was rendered by Judge Kane in *LaFore v. Emblem Tape & Label Co.,* 448 F.Supp. 824, 826 (D.Colo.1978). In that insightful opinion Judge Kane questions the propriety of the use of racial classifications in political or judicial functions, a concern which I share. Moreover, Judge Kane identifies with acuity the fatal flaw in the approach adopted by most courts to date. That is, attempts to provide racial classifications have no scientific justification, lack sophistication, and leads to unavoidable confusion. Thus Judge Kane concludes that the use of such "questionable concepts of race is not productive." In *LaFore* the court rejected all racial classifications and determined that section 1981 was intended to protect all persons from discrimination because they are not a member of the "most favored class," historically a class called "white citizens." While this conclusion may be difficult to adopt in light of the apparent exclusion of gender based or religious discrimination from the protection of section 1981 (*see Runyon v. McCrary,* 427 U.S. at 167, 96 S.Ct. at 2592), the *LaFore* opinion is certainly important for its observations regarding racial classifications.

construed to offer protection to persons who are the objects of discrimination because prejudiced persons may perceive them to be nonwhite, even though such racial characterization may be unsound or debatable."); *Whatley v. Skaggs Companies, Inc.,* 502 F.Supp. 370, 376 (D.Colo.1980) (Plaintiff's allegation of discrimination on the basis of his Mexican-American descent stated a claim under section 1981, *citing Manzanares.*); *Aponte v. National Steel Service Ctr.,* 500 F.Supp. 198, 202–03 (N.D.Ill.1980) (Plaintiff's allegation that he was discriminated against because he was Hispanic found to state a cause of action under section 1981 because "Hispanics are frequently identified as 'nonwhites,' "); *Tayyari v. New Mexico State University,* 495 F.Supp. 1365, 1369–70 (D.N.M.1980) (Plaintiff, an Iranian citizen, found to state a section 1981 cause of action on the basis that he may belong to a group commonly perceived to be different from the white majority.); *Garcia v. Rush-Presbyterian-St. Luke's Medical Ctr.,* 80 F.R.D. 254, 262–64 (N.D.Ill.1978), *aff'd,* 660 F.2d 1217 (7th Cir. 1981) (Mexican and Mexican-American plaintiffs found to state a cause of action under section 1981 because in analyzing discrimination against these groups race, national origin, and ethnicity may be indistinguishable.); *Ortega v. Merit Insurance Co.,* 433 F.Supp. 135, 139 (N.D.Ill.1977) (holding that for today at least persons of Hispanic origin must be accorded the protections of section 1981); *Enriquez v. Honeywell, Inc.,* 431 F.Supp. 901, 904–06 (W.D.Okl.1977) ("the line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible . . . ."); *Budinsky v. Corning Glass Works,* 425 F.Supp. 786, 788 (W.D.Pa.1977) (dicta) (stating that although the term "race" "may be of such doubtful sociological validity as to be scientifically meaningless" there was still a commonly accepted notion of race which included whites, blacks, Hispanics and Indians as separate races protected by section 1981); *see also Puerto Rican Media Action & Educ. Council v. Metromedia Inc.,* 9 EPD ¶ 10,173 (S.D.N.Y.1975) (Puerto Rican plaintiffs found to state section 1981

cause of action); *Maldonado v. Broadcast Plaza, Inc.,* 10 FEP Cases 839, 10 EPD ¶ 10,173 (D.Conn.1974) (Plaintiffs of Puerto Rican descent held to state a cognizable claim under section 1981); *Miranda v. Clothing Workers Local 208,* 10 FEP Cases 557 (D.N.J.1971) (Spanish surnamed plaintiffs' claim under section 1981 recognized).

This third approach to the problem has been gaining support in the federal courts since its first expression in dicta in *Budinsky v. Corning Glass Works,* 425 F.Supp. at 788, and in general has been supported by the commentators. Developments in the Law—Section 1981, *supra* at 89–90; Greenfield & Kates, *Mexican Americans, Racial Discrimination, and the Civil Rights Act of 1866,* 63 Cal.L.Rev. 662 (1975). In the leading case adopting this approach, the Tenth Circuit Court of Appeals observed:

> Of course, section 1981 makes no mention of race, national origin, or alienage. The only reference is that "all persons" shall have described rights and benefits of "white citizens." Thus the standard against whom the measure was to be made were the rights and benefits of white citizens. The measure is group to group, and plaintiff has alleged that the "group" to which he belongs—those he describes as of Mexican American descent—is to be measured against the Anglos as the standard. This is perfectly clear and well understood in the context, and in the geographical area concerned. The allegation is direct that discrimination was directed to members of his group, and to him individually because of his affiliation. We hold that this was sufficient to have withstood the motions to dismiss. In this holding we consider that Mexican American, Spanish American, Spanish-surname individuals, and Hispanos are equivalents, and it makes no difference whether these are terms of national origin, alienage, or whatever. It is apparent that a group so described is of such an identifiable nature that the treatment afforded its members may be measured against that afforded the Anglos.

*Manzanares v. Safeway Stores, Inc.,* 593 F.2d at 970.

After holding that the Supreme Court's references to "racial" discrimination in section 1981 cases could not be read as limiting that statute to a technical or restrictive meaning of race, the *Manzanares* Court then observed that:

> If "white citizens" means a race, which technically does not seem particularly clear, it would seem that a group which is discriminated against because they are somehow different as compared to "white citizens" is within the scope of section 1981. We cannot consider this as a "national origin" case and that alone. Prejudice is as irrational as is the selection of groups against whom it is directed. It is thus a matter of practice or attitude in the community, it is usage or image based on all the mistaken concepts of "race." ... It is sufficient for our purposes that as a matter of common knowledge, and as described in the opinions, a prejudice as alleged in this complaint does exist. It is directed against persons with Spanish surnames. It is a group whose rights can be measured against the standard group or control group referred to in section 1981.

593 F.2d at 971–72.

I find this third approach to the issue before me far more persuasive than the first two outlined above.[21] In particular, the third category of cases appears to have not only recognized the difficulty, if not the impossibility, of defining the term "race" as distinguished from "national origin" but also has attempted to formulate a mode of analysis which avoids that problem. The approach adopted, at least by the *Manzanares* Court was to determine whether the plaintiff in a particular case is a member of a group that is perceived to be distinguishable from "white citizens." If so, such a plaintiff states a cognizable claim under section 1981. This application is in keeping with Congress' intent of guaranteeing the same civil rights to all citizens. *See* Section III, B, *infra*. Thus it extends section 1981's protections to those persons who today are members of groups that, like the then recently freed slaves, are in a position far from equal to that of the majority, historically "white citizens." Moreover, by hinging the "identifiable group" standard on the "common perception" of the group in question, the *Manzanares* approach employs the common law technique of the application of law to changes in the factual reality while limiting the scope of the statute in a way consistent with the apparent intent of its drafters.

The foregoing examination of the background, legislative history and case law regarding section 1981, suggests that plaintiff in this case has stated a cause of action. It may be argued, however, that section 1981 is a statute limited to protection of rights of a "racial" character, implying the existence of some objectively identifiable static classification of populations into race. I shall

---

**21.** Defendants here argue that I should adopt the first approach and hold that the pending claim is one based upon national origin discrimination, not racial, and therefore not within the scope of section 1981. In addition to the cases addressed above, defendants cite to *Ponce de Leon v. Western International Hotels,* 18 FEP Cases 1394 (N.D.Cal.1978) and *Wald v. International Brotherhood of Teamsters,* 24 FEP Cases 616 (C.D.Cal.1980), in support of their position. As with those cases discussed above which apply this first approach I find these cases unpersuasive. The *Ponce de Leon* case contains no citations or discussion but merely holds that a plaintiff's claim for national origin discrimination is dismissed. The *Wald* Court, after a brief analysis, concluded that the case precedent "strongly suggests" a narrow definition of "race" under section 1981 and that the recent trend in the lower courts is that "national origin" claims are not cognizable under section 1981. After conducting my own analysis, it is not clear to me what definitions the *Wald* court attributed to the terms "race" and "national origin." In any event, as to the "trend of recent district court decisions" my count of the cases discussed in the body of this opinion leads me to a very different result than that reached by the Court in *Wald*. Finally, defendants argue, as have some courts, that section 1981 may be narrowly construed because of the availability of relief under Title VII (42 U.S.C. § 2000e, et seq.) to many of the claimants. While it is true that many persons alleging causes of action under section 1981 may also have a claim under Title VII it is difficult for this court to perceive how that fact has any relevancy to determining the appropriate scope of section 1981.

now seek to demonstrate that modern scholarship simply precludes such a concept.

## IV

### RACE IN THE REAL WORLD

As I have noted in several places in this opinion, the Supreme Court has surmised that the protection afforded by section 1981 is essentially racial in character. Nonetheless it has never been required to articulate what "race" means. The Court's dicta has led many lower courts to assume the existence of, and thus search for, some immutable category to which a plaintiff must belong. They cannot do so—for no such immutable category exists.

I begin with the fact most widely agreed upon by modern biologists, anthropologists, and other students of human diversity. The notion of race is a taxonomic device and, as with all such constructs, it exists in the human mind not as a division in the objective universe. I wish to be clear, I do not mean that human differences do not exist—of course they do. Nonetheless, which differences we select to use as a basis of classification is only valid in terms of the reason for classification.

This point may be illustrated by the following example: if an oculist wishes to know how many of a particular corrective lens he should order it is reasonable for him to classify his customers on the basis of visual acuity; if, on the other hand, he wishes to know how many of a given color of frames he needs, it is reasonable for him to classify his customers on the basis of

their color preference. It is important, however, to understand that in so cataloging, the oculist has not changed anything and has not converted his subjects from "customers" to some subcategory. Thus, if the oculist were to call the group of customers who preferred black frames as "A's" and brown frames as "B's" he would not have made a scientific discovery that his customers are "A's" or "B's." Moreover, there is no reason for a person whose interests are different from the oculist to adopt the classification of his customers as "A's" or "B's." That is to say there is nothing inevitable about the form of classification adopted by the classifier. Not only might the customers' tastes in frames change, but the categories themselves are only useful for that purpose and tell us nothing about—for instance—other categories such as visual acuity.

"Race" classifications embody the same kind of process.[22] "Just what constitutes a race is a hard question to answer, since one's classification usually depends on the purpose of classification," S. Molnar, *Races, Types & Ethnic Groups*, 13 (1975). Thus a group of scientists after developing a list of "racial types" emphasized that the list "of 30 'races' might have been ten or 50; the line of discrimination in many cases is arbitrary. . . . If this list does nothing else, we hope that it will bring home to the student the realization that race is not a static thing at all. . . . History, in the biological as well as the cultural senses, is always in motion." C. S. Coon, S. Garn and J. Birdsell, *Races: A Study of the Problems of Race Formation*

---

**22.** For instance, one of the most persistent modes of attempted racial classification is on the basis of skin pigmentation. Traditionally, this mode of classification had a group called Negro or Negroid. Such a classification tells us nothing else about the peoples so classified, *e.g.,* their height (compare African Pigmies with Hottentots), their skeletal structure (*see* Molnar, *supra* at 10–11), skulls (Molnar, *supra* at 19), or intelligence. *See* Dobzhansky and Montagu, *Natural Selection and the Mental Capacities of Mankind,* Science, CV 587–90 (1947). Moreover, ultimately it tells us nothing about skin pigmentation. How much melanin (the principal pigment in humans) in the skin is required for someone to be Negroid? *See* Walter White *Why I Remain a Negro,* Saturday Review of Literature XXX (1947). "The pigmentary difference [in humans] is not one of kind but of degree. The same chemical pigments are present in the skins of all human beings (with the exception of albinos, who have no pigment at all), varying only in its diffusion throughout the body rather than in quality." Montagu, *supra* at 96. Ironically, today in the most racist of societies, the Republic of South Africa, in distinguishing between various groups of people of dark pigmentation the term "black" is now used in contradistinction to "African." *See* R. Ridd, *What's in a Name,* New Society, 5–6 (July 3, 1980).

*In Man,* 140 (1950), *quoted* in Molnar, *supra* at 16.[23] It is, of course, true that Nazi race "scientists" believed in immutable characteristics that existed "out there" (*see* A. Montagu, *Man's Most Dangerous Myth,* 30 passem (1964)), but it appears generally agreed that the "outstanding development of the twentieth century has been the replacement of typological thinking with a populationist approach that takes into account the range of variability of mankind. . . . A consideration of variability and intermediates (the populationist approach) avoids the confusion that was faced by somatology in the early part of this century. At this point . . . there are at least sixty systems for typing human body build, each probably equally valid. The number plus the limited explanatory power of such typologies has shown them to be more art than science." Molnar, *supra* at 12.

Nonetheless, efforts at static racial classification continue. Because no single characteristic was found to be a sufficient basis for classification, more and different elements were included and combined. These too have failed to produce classifications essentially meaningful beyond themselves. "With the newer techniques of taxonomy which utilize computer facilities investigators can process thousands of items of information, . . . . But rather than clarifying and establishing definite boundaries between populations, this additional information raises new questions and often casts doubt on the validity of many older, accepted taxonomic units." Molnar, *supra* at 95.

Much more could be said on the subject of race as a taxonomic function, whose scientific value, if any there be, is limited to classification for a particular purpose only. Suffice to say here that to the degree that science has an answer to the question of what is meant by race, it is only in terms of the further question: tell me why you are classifying. To the degree then that section 1981 requires a court to classify to determine whether a person is a member of a group which is being discriminated against, science supports the *Manzanares* approach to determining the scope of section 1981.

When we narrow our perspective to the question tendered by the motion—namely a distinction between race and national origin, science does aid in resolution—but in a manner which would surprise the judges who believe such a distinction exists.

Today much of modern science's thoughts about the meaning of race, to the degree the term is accepted as meaningful at all, are tied to geographic distribution and culture, *i.e.* the two common components of nationality concepts. Thus, Molnar, after listing seven attempts at definitions of race by biologists or anthropologists, observes "The definitions above, though they appear quite diverse, have in common certain factors that they emphasize. The first is an assumption about the role of geographic distribution in race formation. Primarily, the divisions are based on the sharing of a common territory or point in space. . . ." Molnar, at 14.[24] And as Montagu has written " 'Race,' it should always be remembered is a human grouping which is culturally defined in a given society." Montagu, at p. 137. Thus to the degree that science aids at all in resolution of the legal problem tendered, it appears fair to say that no meaningful distinction can be drawn between "race" and "national origin."

It might be argued, however, that even if there is no scientific content to the notion of race—a common meaning exists—and it should be employed. On examination, however, no single meaning sufficient to resolve the issue exists. First, the dictionary demonstrates that the notion of race is as varia-

**23.** For a brief criticism of Coon's methods of classification *see* Montagu, *supra* at 27.

**24.** The utility of this classification is equally doubtful. For as has been observed, "all human varieties are much more mixed than are plant or animal forms, hence there is a greater dispersion or scattering of characters, which has the effect of producing a considerable amount of intergrading between ethnic groups or varieties. The more or less great variability of all ethnic groups constitutes a genetic proof of their mixed character." Montagu, *supra* at 92.

ble as man's prejudice. *See* Webster's Third New International Dictionary, 1870 (1976), attached hereto as Appendix "A."

Historically, common notions of race divided people either along national lines or the perceiver's subjective evaluation of skin pigmentation. Thus, ancient invaders of India contrasted themselves with the natives on the basis of pigmentation and, in the Han Dynasty (3d Century B.C.), the majority distinguished themselves from the yellow haired, green eyed barbarian people in a distant province "who greatly resemble monkeys from whom they are descended." T. Gossett, *Race, The History of an Idea in America,* 4 (1963) (hereinafter Gossett). In ancient Greece and Rome on the other hand, pigmentation was of little or no consequence, rather deficiencies of the subject races were perceived to be tied to their national origin. Gossett, *supra* at 6–8. This very confusion on the subject of race has animated most of the prejudices throughout the history of this nation.

Without doubt blacks have been the subject of the most persistent racism in this country. Nonetheless, "racial" justification for discrimination against almost every immigrant (and native) group has plagued this country's intellectual history. Both the German and the Irish immigrants (whose descendents are now generally viewed as "native stock") were believed by many Americans to be "racially" inferior (*see* Gossett, *supra* at 287–309), as were of course the Chinese and American Indians. *Id.; see People v. Hall,* 4 Cal. 399 (1854). The history of "racial prejudice" against Jews throughout Europe and in this country appears to be so well known as almost not to require documentation (*see* Gossett, *supra* at 304–06, 371–72, 445–56).[25] Indeed the racist quality of thinking in this country is so persistent that it was even used to explain why Northern whites defeated Southern whites in the American Civil War.[26] The idea of race as an element of the history of ideas in this country has frequently been no more than a vehicle for racism, *i.e.,* a presumed inherited defect in those who are not of the racist's kind, however, he defines his kind.

The lesson of scholarship, then, is that the notion of race is dynamic. Whether one resorts to biology, anthropology or history, the meaning of race turns on why the question is asked and when it is asked. As such section 1981's scope cannot be restricted to some fixed definition, because by incorporating a racial concept the Supreme Court has incorporated a flexible and changing concept. As with the biologists and anthropologists, the answer to race questions in a legal context can only be supplied in terms of the reason for asking the question.

## V

### RESOLUTION OF THE MOTION

In a recent opinion this court has had occasion to stress the need for definitions in the law. *See Harris v. Tomczak,* 97 F.R.D. 687 (E.D.Cal.1982). Although definitions in a dynamic context are difficult, they are not impossible. The purpose of the definition in this case is to identify those who state a cognizable claim under the statute. To do so, the plaintiff must belong to a distinctive group, one element of the definition of which is that it has been treated differently than the group enjoying the broadest civil rights. Groups being so discriminated against vary in accordance with

25. Thus, even if the Supreme Court's observation that religious discrimination is not covered by section 1981, it does not necessarily follow that discrimination against Jews would be excluded.

26. "Years after the [Civil] war was over, one northern observer thought that it had been waged between two distinct races—the Goths of the North typified by the matter-of-fact and steady Grant and the Celts of the South typified by fire-eating southern gentlemen. The proponent of this novel view traced the cause of the war back to early immigration from separate parts of England. As late as the 1920's, Clinton S. Burr explained the Civil War as representing a race war between the 'yeomanry' of New England who were 'Anglo-Saxon in the strictest sense of the word' on the one side, and the 'Normans' of the South, on the other." T. Gossett, *Race, the History of an Idea in America,* 311 (1963).

the historical context. Thus the appropriate means of definition involve inclusive but not exclusive criteria.[27] Because the issue of racial classification is dynamic and not static no group is necessarily excluded. Moreover, this form of definition, because it does not forever fix racial classifications avoids the problems inherent in government racial classification. As Judge Kane so aptly noted "[t]he use of racial classifications or distinctions in political or judicial functions is fraught with peril." *LaFore v. Emblem Tape & Label Co.,* 448 F.Supp. 824, 826 (D.Colo.1978). To be blunt, the court should not be in the business of permanently classifying groups of people, not just because it is unpalatable—but because it is untrue.

■ I thus conclude that a section 1981 cause of action lies in the kind of case presented here where plaintiff alleges discrimination on the basis of membership in a group composed of both men and women, the boundaries of which are not fixed by age or exclusively by religious faith, and which is of a character that it is or may be perceived as distinct when measured against the group which enjoys the broadest rights.[28]

■ In this regard plaintiff alleges that she is of Puerto Rican descent. Whether such allegation is viewed as one of membership in a discrete unit (Puerto Ricans) or as of membership in a broader "Hispanic" group, plaintiff, in effect, alleges that she is a member of a distinct group which has been recognized as having been the subject of discrimination. She alleges that on the basis of her Puerto Rican descent and accent she was first denied promotions for which she was qualified and eventually terminated by the defendants. Under the

standards set forth in Section II of this opinion, plaintiff may prove a set of facts under the definition set forth above which would entitle her to relief pursuant to section 1981. Thus, construing the complaint in the light most favorable to the pleader it must be said that plaintiff can prove facts in support of her claim. Therefore, and for the reasons set forth above, the defendants' motion to dismiss the section 1981 claim will be denied.

## APPENDIX "A"

¹race \"\ *n* -s [MF, generation, family, fr. It *razza*] 1 a *obs* : GENERATION¹ b *obs* : the act of breeding or producing offspring (male he created thee, but thy consort female for ~ —John Milton) c : a breeding stock of animals (~ of mares) 2 a : the descendants of a common ancestor : a family, tribe, people, or nation belonging to the same stock (the impoverished scion of a noble ~) b : a class or kind of individuals with common characteristics, interests, appearance, or habits as if derived from a common ancestor (the ~ of doctors) (the whole ~ of mankind —Shak.) (the Anglo-Saxon ~) (the Jewish ~) 3 : any of various infraspecific taxonomic groups: as a : MICROSPECIES b : SUBSPECIES c : a permanent or fixed variety d : BREED e : PHYSIOLOGIC RACE f : a division of mankind possessing traits that are transmissible by descent and sufficient to characterize it as a distinct human type (Caucasian ~) (Mongoloid ~) 4 *obs* : inherited temperament or disposition (now I give my sensual ~ the rein —Shak.) 5 a : distinctive flavor, taste, or strength (as of wine) : the quality indicating origin or kind b *archaic* : RACINESS

SYN RACE, NATION, and PEOPLE, even though in technical use they are commonly differentiated, are often used popularly and interchangeably to designate one of a number of great divisions of mankind, each made up of an aggregate of persons who are thought of, or think of themselves, as comprising a distinct unit. In technical discriminations, all more or less controversial and often lending themselves to great popular misunderstanding or misuse, RACE is anthropological and ethnological in force, usu. implying a distinct physical type with certain unchanging characteristics, as a particular color of skin or shape of skull (the Caucasian *race*) (the Malay *race*) (the Ethiopian *race*) although sometimes, and most controversially, other presumed common factors are chosen, as place of origin (the Nordic *race*) or common root language (the Aryan *race*). In popular use RACE can apply to any more or less clearly defined group thought of as a unit usu. because of a common or presumed common past (the Anglo-Saxon *race*) (the Celtic *race*) (the Hebrew *race*) NATION, primarily political in force, usu. designates the citizenry as a whole of a sovereign state and implies a certain homogeneity because of common laws, institutions, customs, or loyalty (the British *nation*) (the French *nation*) (the house must have been built before this country was a *nation* —Allen Tate) (what is a *nation*? A group of human beings recognizing a common history and a common culture, yearning for a common destiny, assuming common habits, and generally attached to a specific piece of the earth's surface —David Bernstein) Sometimes it is opposed to *state* (a state is accidental; it can be made or unmade; but a *nation* is something real which can be neither made nor destroyed —J.R.Green) and often not clearly distinguishable from RACE in comprising any large group crossing national boundaries and with something significantly in common (the children of the world are one *nation;* the very old, another —Jan Struther) (for the two *nations* that alone inhabit the earth, the rich and the poor —Edith Sitwell) (the Gypsy *nation*) PEOPLE sometimes interchangeable with NATION though stressing a cultural or social rather than a national unity, can apply to a body of persons, as a whole or as individuals, who show a consciousness of solidarity or common characteristics

27. Thus, no one element would constitute a necessary and sufficient condition for an individual to be protected by section 1981 and the presence or absence of any one element would not be cause to exclude a plaintiff from the scope of the statute. These kinds of definitions have been more properly characterized as "family resemblances" that one can gather to form a model of what one is attempting to define without breaking the subject down into

discrete, mandatory, and preemptive conditions. Rather, a family resemblance definition does not dictate any necessary elements of the subject. *See* L. Wittgenstein, *Philosophical Investigations,* ¶¶ 66, 67 (3d Ed. G. Anscombe trans. 1958).

28. The plaintiff's group must, of course, be one which is distinctive within the implied statutory taxonomy.